Stone, Appellant, *v.* Pennsylvania Public Utility Commission.

574

Argued April 13, 1960. Before RHODES, P. J., GUN-THER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONT-GOMERY, JJ.

*Virginia Funk,* for protestant, appellant.

*Edward Munce,* Assistant Counsel, with him *Herbert E. Squires,* Assistant Counsel, and *Thomas M. Kerrigan,* Counsel, for Pennsylvania Public Utility Commission, appellee.

*Henry Paul Sullivan,* with him *Samuel Graff Miller,* and *Vincent P. McDevitt,* for utility company, intervening appellee.

OPINION BY WRIGHT, J., June 15, 1960:

We are here concerned with an appeal by Jady B. Stone from an order of the Pennsylvania Public Utility Commission, dated January 18, 1960, granting an application of the Philadelphia Electric Company, hereinafter referred to as Philadelphia, for approval of the exercise of the right of eminent domain under the provisions of the Act of May 21, 1921, P. L. 1057, 15 P.S. 1182, in acquiring a right of way across appellant's farm in the Township of Peach Bottom, York County, for the construction, operation and maintenance of a high-power transmission line. Philadelphia was granted permission to become an intervening appellee.

The record discloses that Philadelphia plans to construct a 220,000 volt transmission line from its Nottingham Substation in Chester County, Pennsylvania, via its proposed Peach Bottom Generating Station in York County, Pennsylvania, to a point on the Pennsylvania-Maryland State line where it will connect with a similar line to be constructed by the Baltimore Gas and Electric Company, hereinafter referred to as Baltimore, extending from its Graceton Substation in Harford County, Maryland. The route of Philadelphia's portion of this transmission line traverses the Stone farm. The nature of the Peach Bottom Generating Station

and the reasons for the construction of the line appear in the testimony of Philadelphia's supervising electrical engineer, Arthur H. Sellers, a portion of which is set forth in the footnote.[1]

---

[1] "The Peach Bottom generating station will be the world's first high-temperature, helium cooled nuclear power plant. Pursuant to the enactment by the Congress of the United States of the necessary authorization and appropriation acts, a contract has been entered into between the Atomic Energy Commission and Philadelphia Electric Company authorizing the construction and operation with 51 other utilities, and on completion it will be owned by and operated by Philadelphia Electric and will become a part of its system . . .

"The proposed interconnection between Philadelphia Electric Company and Baltimore Gas and Electric Company, which will have a capability of transmitting over 400,000 kvs, will provide the strong link necessary to properly integrate these two systems so as to meet, adequately and safely, the varying and growing system load demands and to maintain constant voltage and frequency stability.

"Moreover, by increasing the alternate sources of supply, this interconnection also improves reliability of service on both systems during periods of emergency caused by loss of transmission lines or generating capacity.

"Both Philadelphia Electric Company and Baltimore Gas and Electric Company systems lie within Federal Power Commission areas 5 and 6, in which a total generating capacity in excess of ten million kilowatts is integrated and operated as the Pennsylvania-New Jersey-Maryland Interconnection. At present, no direct tie exists between the systems of Philadelphia and Baltimore although each is connected directly with other neighboring systems.

"The proposed high voltage interconnection will provide needed reinforcement to the transmission system of the Pennsylvania-New Jersey-Maryland Interconnection and to FPC areas 5 and 6, and thus will benefit not only customers of the Philadelphia Electric Company and the Baltimore Gas and Electric Company but also all customers served by the interconnecting companies . . .

". . . Located within the territory served by the Pennsylvania-New Jersey-Maryland Interconnection is a high concentration of industrial, commercial and research organizations including ship-

In the early part of 1958, Philadelphia and Baltimore initiated studies of the area between the site of the proposed Peach Bottom Generating Station and the site of the Graceton Substation in order to select a general route for the transmission line between those two units, and to determine the contact point along the Pennsylvania-Maryland border where the Philadelphia and Baltimore portions of the line would connect. As a result of those studies, and of several meetings in the field, a mutually satisfactory contact point was agreed upon. Beginning about the middle of 1958, using existing maps and airplane pictures, studies were made by Philadelphia covering the entire area between the site of the Nottingham substation and the contact point at the Pennsylvania-Maryland border to determine the most reasonable and feasible route for a high-power transmission line which would connect those two points while also passing through the site of the proposed Peach Bottom Generating Station. This procedure involved a detailed analysis of the terrain, including the location of buildings and other improvements. Owners of the individual properties which the line was to traverse were then contacted. Negotiations conducted with appellant did not result in an agreement, wherefore the instant proceeding was instituted.[2]

building, oil refining, steel, heavy machinery, aircraft and other plants. These industries and other establishments are essential both to the nation's peacetime economy and to national defense. Under conditions of national emergencies, the probabilities of shortage of materials require an integrated high capacity transmission network so that power deficient areas may be immediately supplemented with energy supplied from adjacent areas or adjacent companies which have capacity available".

[2] It was stated at oral argument that this appellant is the only one of 65 property owners with whom an agreement has not been reached.

At the hearing before the Commission's examiner, October 14, 1959, appellant filed an answer to Philadelphia's application alleging as new matter that an alternate route should be selected. George E. Seigert, an electrical engineer whose competency was vigorously questioned, testified for appellant as to this possible alternate route. The supervisor of Philadelphia's real estate department, John A. Dugan, testified that it was not feasible to reroute the line in order to avoid the Stone farm. Mr. Dugan stated: "It would increase the length of the line, put many more angles in the line, and confront us with an impossible block on the York road where we couldn't get through immediately north and south of the Stone property. There isn't sufficient open country". Upon full consideration of all matters involved, the Commission found that Philadelphia had not acted wantonly or capriciously in selecting the proposed route, and that the service to be furnished through the exercise of the requested right of eminent domain was necessary and proper for the service, accommodation, convenience and safety of the public.

Appellant's first and last (sixth) contentions are that the service proposed by Philadelphia is not necessary, and that the interconnection will not result in greater economy of operation. It is argued that "the majority of the power transmission system is to be used for the power distribution from the Nuclear Plant", which "is not a public service until its worth is proven", that the entire proceeding "is a subterfuge", and that the "extreme high cost of the nuclear fuel and helium, not to mention the initial high cost of the reactor itself, does not contribute to higher economy at the present time". The record lends no support whatever to these contentions. The public necessity and propriety of the service here involved are fully demonstrated by Philadelphia's uncontroverted evi-

dence. One of the principal considerations of public convenience and necessity is the need for integration of the bulk power transmission systems of Philadelphia and Baltimore. Notwithstanding appellant's unsupported assertion to the contrary, it clearly appears that the interconnection will enable both systems to obtain greater economies of operation. Furthermore, each system will be able to meet, adequately and safely, its varying and growing load demands, and to maintain constant voltage, frequency stability, and reliability of service. Another principal element of necessity is that there are no existing facilities to provide for the transmission of the initial block of power from the proposed Peach Bottom Generating Station to distribution centers. Last but not least, there is the important element of need for additional power supply routes in the event of a national emergency.

Appellant's second and third contentions relate to the suggested alternate route, by virtue of the selection of which appellant argues that "the same result can be accomplished". It is settled law that the designation of the route for the line was a matter for determination by Philadelphia's management in the first instance, and its conclusion will be upheld unless shown to be wanton or capricious: *Byers v. Pa. P. U. C.*, 176 Pa. Superior Ct. 620, 109 A. 2d 232; *Phillips v. Pa. P. U. C.*, 181 Pa. Superior Ct. 625, 124 A. 2d 625; *Laird v. Pa. P. U. C.*, 183 Pa. Superior Ct. 457, 133 A. 2d 579. While appellant argues that the suggested alternate route "could be adopted", he does not contend that it is in any way superior to the route proposed by Philadelphia other than the fact that it avoids his property. As pointed out in the *Byers, Phillips,* and *Laird* cases, the Commission is not required to withhold its approval merely because another route might have been adopted which would cause the prop-

erty owner less damage or reduce the inconvenience to him in the operation of his property.

Appellant's fourth contention is that the proposed nuclear plant "is not a proven safe power unit". He argues that the plant is experimental in nature and that there is a potential danger of radiation leakage. It is sufficient to point out in this connection that the design of the Peach Bottom Generating Station was in no way an issue before the Commission in this proceeding. The Atomic Energy Commission is charged by law[3] with the responsibility of overseeing all of the aspects of any nuclear power plant which may be constructed in this country. With regard to safety factors, the Act of Congress provides that no license shall be issued to construct and operate such a plant if it "would be inimical to the common defense and security or to the health and safety of the public".

Appellant's fifth contention is that the selection of the route of the line by Philadelphia "was wanton and capricious ". Again, the record lends no support whatever to appellant's contention in this regard. Philadelphia's evidence clearly establishes that the proposed route was chosen only after detailed investigation and mature consideration of all pertinent factors. The painstaking and thorough procedure in which the course of the route was determined negates any question of wanton or capricious action on the part of Philadelphia, and the Commission properly so found.

In brief, we perceive no merit in this appeal. As stated in *Laird v. Pa. P. U. C.*, supra, 183 Pa. Superior Ct. 457, 133 A. 2d 579: "We are not unsympathetic with appellant's situation. It is reasonable to assume that property owners in general would prefer not to

---

[3] Act of Congress of August 1, 1946, 68 Stat. 921 et seq., 42 U.S.C. 2011 et seq.

have a power line cross their lands. However, the area to be served includes oil refineries, ship building, steel production, and other industries vital to the nation's peacetime economy and national defense . . . The location finally decided upon, and the manner of construction, were dictated by considerations which, in the Commission's judgment, management had justifiably found controlling. Having performed our function on this appeal, we find no abuse of discretion, error of law, or lack of evidence to support the finding, determination and order of the Commission".

The order of the Commission is affirmed.