Commonwealth, Appellant, *v.* National Gettysburg Battlefield Tower, Inc.

194

Argued June 27, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused December 5, 1973.

*Israel Packel*, Attorney General, with him *Lawrence Silver, Justin Blewitt* and *David Kurtz*, Deputy Attorneys General, for appellants.

*Jerome H. Gerber*, with him *Handler, Gerber, Widmer and Weinstock*, for appellees.

*Philip Weinberg*, Assistant Attorney General, with him *Joel H. Sachs*, Assistant Attorney General, *Samuel A. Hirshowitz*, First Assistant Attorney General, and *Louis J. Lefkowitz*, Attorney General, for State of New York, amicus curiae.

*Robert E. Woodside*, for amicus curiae.

OPINION BY MR. JUSTICE O'BRIEN, October 3, 1973:

On July 3, 1971, National Gettysburg Battlefield Tower, Inc. (the Tower Corporation) and Thomas R. Ottenstein, two of the appellees, negotiated an agreement with the United States Government, acting through the Director of the National Park Service, in which the Tower Corporation conveyed certain land to the government and agreed to abandon construction of an observation tower near the Gettysburg Battlefield, at an area found objectionable to the Park Service, in exchange for the government's cooperation and permission to build the tower in another area near the battlefield. The Tower Corporation also agreed to establish a charitable foundation to support the Park Service's activities at Gettysburg and at the Eisenhower Farm Historical Sight, and to construct the tower in accordance with certain specifications, with the height of the tower to be limited to 307 feet. The Park Service also conveyed a right of way for limited access to the proposed observation tower sight.

What the National Park Service was originally willing to permit,[1] the Commonwealth of Pennsylvania, appellant herein, sought to enjoin. On July 20, 1971, the Commonwealth brought an action in the Court of Common Pleas of Adams County, to enjoin construction of the proposed 307-feet tower, alleging that the proposed construction was a "despoliation of the natural and historic environment," because, in the words of one critic: "The tower as proposed . . . would disrupt the skyline, dominate the setting from many angles, and still further erode the natural beauty and setting which

---

[1] In May, 1973, after an appeal had been filed in this case, the Park Service's Advisory Counsel of Historic Preservation finally came out with a report recommending that the United States Government assist the Commonwealth in opposing the construction of the tower. Apparently, the report had previously been lost within the bureau.

once was marked by the awful conflict of a brother's war."[2]

At the trial, the Commonwealth produced a number of witnesses who generally agreed that they found the tower, in their opinion, to be detrimental to the historic, scenic, and aesthetic environment of Gettysburg. Appellees, on the other hand, produced experts who found the geometric form of the tower to be aesthetically pleasing and its design, while unobtrusive, to be of great educational value because it would provide "the full sweep or overview of a landscape where a significant event in American history took place."

The chancellor, after making detailed findings concerning the location and characteristics of the tower and the neighborhood of the park, concluded that the Commonwealth had failed to show by clear and convincing proof that the natural, scenic, historic or aesthetic values of the Gettysburg environment would be injured by the erection of the tower. In order to reach the ultimate issue, the chancellor first found to be without merit the defense interposed by appellees that Article 1, §27 of the Pennsylvania Constitution—upon which the Commonwealth relied for the authority of the Attorney General to bring this suit—was not self-executing and, therefore, legislative authority was required before the suit could be brought.

On appeal to the Commonwealth Court, all members of the Court agreed that the Commonwealth had failed to carry its burden of proof on the issue of whether the tower would injure the Gettysburg environment. However, President Judge BOWMAN filed a concurring opinion in which he stated he believed that it was not necessary to reach the difficult question of whether

---

[2] Dr. Milton E. Flower, Professor of Political Science, Dickinson College; Member, Board of Directors, Cumberland County Historical Society, quoted in the Commonwealth's complaint.

the amendment was self-executing and Judge MENCER filed a concurring and dissenting opinion in which he dissented from the majority's holding that Article 1, §27 was self-executing. Because of the importance of the questions involved, we granted allocatur and, on June 8, 1973, we granted the Commonwealth's petition for a supersedeas to stop further construction of the tower pending the outcome of this appeal.

Initially, it should be stated that, as was recognized by Judge ROGERS, speaking for the majority of the Commonwealth Court: "There are no regulations of Cumberland Township, Adams County, the municipality in which the site is located, governing the construction of towers; indeed, there is not one zoning ordinance in all of Adams County. The plans for the tower have, however, been approved for safety by the Department of Labor and Industry of the Commonwealth. By familiar principles, the appellees, as the owners of the site, may use their property as they please, provided they do not interfere with their neighbors' reasonable enjoyment of their properties and subject to reasonable regulations for the public good imposed under the police power of the State, of which there are none here. This right derives from Article I, Sections 1 and 10 of the Pennsylvania Constitution and the Fourteenth Amendment to the Federal Constitution."

Similarly, there is no statute of the Pennsylvania Legislature, which would authorize the Governor and the Attorney General to initiate actions like the lawsuit in the instant case. Rather, authority for the Commonwealth's suit is allegedly based entirely upon Article 1, §27 of the State Constitution, ratified by the voters of Pennsylvania on May 18, 1971, which reads as follows: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common

property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

It is the Commonwealth's position that this amendment is self-executing; that the people have been given a right "to the preservation of the natural, scenic, historic and esthetic values of the environment," and "that no further legislation is necessary to vest these rights in the people."

The general principles of law involved in determining whether a particular provision of a constitution is self-executing were discussed at length in *O'Neill v. White*, 343 Pa. 96, 22 A. 2d 25 (1941). In that case, we explained at pages 99-100:

"The Constitutional provision invoked by appellees is unavailing in this case, for this provision is not self-executing and its mandate cannot be carried out because the legislature has not provided the means for doing so. 'A Constitution is primarily a declaration of principles of the fundamental law. Its provisions are usually only commands to the legislature to enact laws to carry out the purposes of the framers of the Constitution, or mere restrictions upon the power of the legislature to pass laws, yet it is entirely within the power of those who establish and adopt the Constitution to make any of its provisions self-executing.' 6 R.C.L., section 52, p. 57.

"Cooley's Constitutional Limitations (8th ed.), Vol. 1, p. 165 says: 'But although none of the provisions of a constitution are to be looked upon as immaterial or merely advisory, there are some which, from the nature of the case, are as incapable of compulsory enforcement as are directory provisions in general. The reason is that, while the purpose may be to establish rights or to impose duties, they do not in and of themselves constitute a sufficient rule by means of which such right

may be protected or such duty enforced. In such cases, before the constitutional provision can be made effectual, supplemental legislation must be had; and the provision may be in its nature mandatory to the legislature to enact the needful legislation, though back of it there lies no authority to enforce the command. Sometimes the constitution in terms requires the legislature to enact laws on a particular subject; and here it is obvious that the requirement has only a moral force: the legislature ought to obey it; but the right intended to be given is only assured when the legislation is voluntarily enacted.'

"In Davis v. Burke, 179 U. S. 399, 403, the United States Supreme Court said: 'Where a constitutional provision is complete in itself it needs no further legislation to put it in force. When it lays down certain general principles, as to enact laws upon a certain subject, or for the incorporation of cities of certain population, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution.' "

The Commonwealth makes two arguments in support of its contention that §27 of Article 1 is self-executing. We find neither of them persuasive.

First, the Commonwealth emphasizes that the provision in question is part of Article 1 and that no provision of Article 1 has ever been judicially declared to be nonself-executing. The Commonwealth places particular emphasis on the wording of §25 of Article 1. See *Erdman v. Mitchell*, 207 Pa. 79, 56 A. 327 (1903). Section 25 of Article 1 reads as follows: "'To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate."

However, it should be noted that Article I is entitled "Declaration of Rights" and all of the first twenty-six sections of Article 1 which state those specific rights, must be read as limiting the powers of government to interfere with the rights provided therein.

Section 25 of Article 1 should be read as summarizing the philosophy of the first twenty-four sections of Article 1, particularly when it declares that: ". . . everything in this article is *excepted out of the general powers of government* and shall remain forever inviolate." (Emphasis supplied.)

Unlike the first twenty-six sections of Article 1, §27, the one which concerns us in the instant case, does not merely contain a limitation on the powers of government. True, the first sentence of §27, which states: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment," can be read as limiting the right of government to interfere with the people's right to "clean air, pure water, and to the preservation of the natural, scenic, historic and aesthetic values of the environment." As such, the first part of §27, if read alone, could be read to be self-executing.

But the remaining provisions of §27, rather than limiting the powers of government, expand these powers. These provisions declare that the Commonwealth is the "trustee" of Pennsylvania's "public natural resources" and they give the Commonwealth the power to act to "conserve and maintain them for the benefit of all people." Insofar as the Commonwealth always had a recognized police power to regulate the use of land, and thus could establish standards for clean air and clean water consistent with the requirements of public health, §27 is merely a general reaffirmation of past law.[3] It must be recognized, however, that up until

---

[3]No one has ever contended that the exercise of such police powers did not require specific legislation.

now, aesthetic or historical considerations, by themselves, have not been considered sufficient to constitute a basis for the Commonwealth's exercise of its police power. See *Kerr's Appeal*, 294 Pa. 246, at 250.

Now, for the first time, at least insofar as the state constitution is concerned, the Commonwealth has been given power to act in areas of purely aesthetic or historic concern.

The Commonwealth has cited no example of a situation where a constitutional provision which expanded the powers of government to act against individuals was held to be self-executing. The only case cited by the Commonwealth, which dealt with a provision which expanded governmental power, *Smith v. Cameron*, 123 Ore., 501, 262 P. 946 (1928), was decided in direct conflict with the Commonwealth's position.[4]

In *Smith v. Cameron, supra,* the Oregon Supreme Court was faced with a constitutional amendment which made a "waterway" a "public use" for purposes of the state's eminent domain law. The court held that although the word "waterway" did not require statutory definition, statutory authority was still required before the power of eminent domain could be exercised for purposes of a "waterway."

It should be noted that §27 does not give the powers of a trustee of public natural resources to the *Governor* or to the *Attorney General* but to the *Commonwealth.* Article 4 of the State Constitution, which provides in §1 that: "The Executive Department of this Commonwealth shall consist of a Governor, Lieutenant Governor, Attorney General, Auditor General, State Treasurer, and Superintendent of Public Instruction," de-

---

[4] The other cases cited by the Commonwealth all dealt with general housekeeping provisions establishing procedures for the operations of government. See, for example, *Hagen v. Smith*, 366 Pa. 501, 78 A. 2d 801 (1951) ; *O'Neill v. White*, supra; *Lewis v. Lackawanna County*, 200 Pa. 590, 50 A. 162 (1901).

fines the duties of an executive generally, in §2, to mean that the Governor: "shall take care that the laws be faithfully executed."

Although other specific executive powers are enunciated in §§7, 8, 9, 10, 11, 12, 15 and 16, nowhere does it state that it is the Governor who is to act or how he is to act whenever the Commonwealth is given the powers of trustee.

Under a constitution providing for a balance of powers, such as Pennsylvania's State Constitution, when power is given simply to the Commonwealth, it is power to be shared by the government's three co-equal branches. The governor cannot decide, alone, how or when he shall exercise the powers of a trustee. It is not for him alone to determine when the "natural, scenic, historic, and esthetic values of the environment" are sufficiently threatened as to justify the bringing of an action. After all, "clean air," "pure water" and "the natural, scenic, historic and esthetic values of the environment," have not been defined. The first two, "clean air" and "pure water," require technical definitions, since they depend, to some extent, on the technological state of the science of purification. The other values, "the natural, scenic, historic and esthetic values" of the environment are values which have heretofore not been the concern of government. To hold that the Governor needs no legislative authority to exercise the as yet undefined powers of a trustee to protect such undefined values would mean that individuals could be singled out for interference by the awesome power of the state with no advance warning that their conduct would lead to such consequences.

If we were to sustain the Commonwealth's position that the amendment was self-executing, a property owner would not know and would have no way, short of expensive litigation, of finding out what he could do with his property. The fact that the owner contem-

plated a use similar to others that had not been enjoined would be no guarantee that the Commonwealth would not seek to enjoin his use.[5] Since no executive department has been given authority to determine when to move to protect the environment, there would be no way of obtaining, with respect to a particular use contemplated, an indication of what action the Commonwealth might take before the owner expended what could be significant sums of money for the purchase or the development of the property.

We do not believe that the framers of the environmental protection amendment could have intended such an unjust result, one which raises such serious questions under both the equal protection clause and the due process clause of the United States Constitution. In our opinion, to insure that these clauses are not violated, the Legislature should set standards and procedures for proposed executive action.[6]

The Commonwealth also argues that the Pennsylvania environmental protection amendment is self-executing by comparing it with similar constitutional amendments enacted in Massachusetts,[7] Illinois,[8] New

[5] Appellees contend, in fact, that the relief sought by the Commonwealth would unconstitutionally deny them the equal protection of the laws because the Commonwealth has arbitrarily singled out the proposed tower at a time when the Gettysburg area is becoming "pockmarked" with numerous business establishments and junk yards which, appellees contend, pose even more of a threat to the "historic and aesthetic" values of the environment than does the proposed tower.

[6] See, for example, the procedures governing the Commonwealth's efforts to control and eliminate water pollution. *Commonwealth v. Harmar Coal Co.*, 452 Pa. 77, 306 A. 2d 308 (1973).

[7] "The people shall have a right to clean air, pure water, freedom from excessive and unnecessary noise and the scenic, historic and aesthetic qualities of their enviroment. . . ." (Massachusetts House Bill No. 3875, passed August 5, 1970.)

[8] "1. Public Policy—Legislative Responsibility. The public policy of the State and the duty of each person is to provide and maintain

York,[9] and Virginia,[10] all of which are obviously not self-executing. The Commonwealth seeks to put great

a healthful environment for the benefit of this and future generations. The General Assembly shall provide by law for the implementation and enforcement of this public policy.

"2. The Rights of Individuals. Each person has the right to a healthful environment. Each person may enforce this right against any party, governmental or private, through appropriate legal proceedings subject to reasonable limitation and regulation as the General Assembly may provide by law." (Illinois Constitution, Article 11.)

[9] "The policy of the state shall be to conserve and protect its natural resources and scenic beauty and encourage the development and improvement of its agricultural lands for the production of food and other agricultural products. The legislature, in implementing this policy, shall include adequate provision for the abatement of air and water pollution and of the excessive and unnecessary noise, the protection of agricultural lands, wetlands and shorelines, and the development and regulation of water resources. The legislature shall further provide for the acquisition of lands and waters, including improvements thereon and any interest therein, outside the forest preserve counties, and the dedication of properties so acquired or now owned, which because of their natural beauty, wilderness character, or geological, ecological or historical significance, shall be preserved and administered for the use and enjoyment of the people. Properties so dedicated shall constitute the state nature and historical preserve and they shall not be taken or otherwise disposed of except by law enacted by two successive sessions of the legislature." New York Constitution Article 14, §4.

[10] "Section 1. To the end that the people have clean air, pure water, and the use and enjoyment for recreation of adequate public lands, waters, and other natural resources, it shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources, its public lands, and its historical sites and buildings. Further, it shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth.

"Section 2. In the furtherance of such policy, the General Assembly may undertake the conservation, development, or utilization of lands or natural resources of the Commonwealth, the acquisition and protection of historical sites and buildings, and the

store in the fact that Pennsylvania's amendment, alone, does not specifically provide for legislative implementation. However, we find it more significant that all of these other states, which expanded the powers of their governments over the natural environment in the same way as Article 1, §27 expanded the powers of the Commonwealth, recognized that legislative implementation was necessary before such new power could be exercised.

To summarize, we believe that, the provisions of §27 of Article 1 of the Constitution merely state the general principle of law that the Commonwealth is trustee of Pennsylvania's public natural resources with power to protect the "natural, scenic, historic, and esthetic values" of its environment. If the amendment was self-executing, action taken under it would pose serious problems of constitutionality, under both the equal protection clause and the due process clause of the Fourteenth Amendment. Accordingly, before the environmental protection amendment can be made effective, supplemental legislation will be required to define the values which the amendment seeks to protect and to establish procedures by which the use of private property can be fairly regulated to protect those values.

By reason of our disposition of this appeal, it is unnecessary to decide the other issues raised by the Commonwealth.

---

protection of its atmosphere, lands, and waters from pollution, impairment, or destruction, by agencies of the Commonwealth or by the creation of public authorities, or by leases or other contracts with agencies of the United States, with other states, with units of government in the Commonwealth, or with private persons or corporations. Notwithstanding the time limitations of the provisions of Article X, Section 7, of this Constitution, the Commonwealth may participate for any period of years in the cost of projects which shall be the subject of a joint undertaking between the Commonwealth and any agency of the United States or of other states." Virginia Constitution, Article XI.

Order of the Commonwealth Court, affirming the Decree of the Court of Common Pleas of Adams County, is affirmed. Costs on appellant.

Mr. Justice NIX concurs in the result.

———

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

I agree that the order of the Commonwealth Court should be affirmed; however, my reasons for affirmance are entirely different from those expressed in the opinion of Mr. Justice O'BRIEN (joined by Mr. Justice POMEROY).

I believe that the Commonwealth, even prior to the recent adoption of Article I, Section 27 possessed the inherent sovereign power to protect and preserve for its citizens the natural and historic resources now enumerated in Section 27. The express language of the constitutional amendment merely recites the "inherent and indefeasible rights" of mankind relative to the environment which are "recognized and unalterably established" by Article I, Section 1 of the Pennsylvania Constitution.

Prior to the adoption of Article I, Section 27, it was clear that as sovereign "the state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. . . ." *Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237, 27 S. Ct. 618, 619 (1907). The proposition has long been firmly established that "[i]t is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted . . . , that the forests on its mountains, be they better or worse, and whatever domestic destruction they have suffered, should not be further destroyed or threatened . . . , that the crops and orchards on its hills should not be endangered . . . ." *Id.* at 238, 27 S. Ct.

at 619. Parklands and historical sites, as "natural resources"[1] are subject to the same considerations.

Moreover, "it must surely be conceded that, if the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them. . . ." *Missouri v. Illinois,* 180 U.S. 208, 241, 21 S. Ct. 331, 344 (1901). Since natural and historic resources are the common property of the citizens of a state, see *McCready v. Virginia,* 94 U.S. 391 (1876), the Commonwealth can—and always could—proceed as parens patriae acting on behalf of the citizens and in the interests of the community,[2] or as trustee of the state's public resources.[3]

However, in my view, the Commonwealth, on this record, has failed to establish its entitlement to the equitable relief it seeks, either on common-law or constitutional (prior or subsequent to Section 27) theories. The chancellor determined that "[t]he Commonwealth has failed to show by clear and convincing proof that the natural, historic, scenic, and aesthetic values of the Gettysburg area will be irreparably harmed by the erection of the proposed tower at the proposed

---

[1] See *Snyder v. Board of Park Comm'rs,* 125 Ohio St. 336, 339, 181 N.E. 483, 484 (1932): "[We] are of opinion that, to the extent to which a given area possesses elements or features which supply a human need and contribute to the health, welfare and benefit of a community, and are essential for the well being of such a community and the proper enjoyment of its property devoted to park and recreational purposes, the same constitute natural resources."

[2] See *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S. Ct. 716 (1945); *Sparhawk v. Union Passenger Ry. Co.,* 54 Pa. 401 (1867).

[3] See, e.g., *Illinois Central R.R. Co. v. Illinois,* 146 U.S. 387, 13 S. Ct. 110 (1892); Sax, the Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention, 68 Mich. L. Rev. 471 (1970); cf. *Abel v. Girard Trust Co.,* 365 Pa. 34, 41, 73 A. 2d 682, 685 (1950); Restatement (Second) of Trusts §391 (1959); Broughton, The Proposed Pennsylvania Declaration of Environmental Rights, 41 Pa. B. Ass'n Q. 421, 422-23 (1970).

site." I believe that the chancellor correctly denied equitable relief. The Commonwealth Court concluded that the chancellor's findings should not be disturbed and that the Commonwealth was not entitled to relief.

I am unable, on this record, to find any error in either the chancellor's determination or that of the Commonwealth Court. Moreover, I entertain serious reservations as to the propriety of granting the requested relief in this case in the absence of appropriate and articulated substantive and procedural standards. See *Just v. Marinette County,* 56 Wisc. 2d 7, 201 N.W. 2d 761 (1972).

Mr. Justice MANDERINO joins in this concurring opinion.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:

This Court has been given the opportunity to affirm the mandate of the public empowering the Commonwealth to prevent environmental abuses; instead, the Court has chosen to emasculate a constitutional amendment by declaring it not to be self-executing. I am compelled to dissent.

Article I, Section 27, of the Commonwealth's Constitution was passed by the General Assembly and ratified by the voters on May 18, 1971.[1]

Its provisions are clear and uncomplicated: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and aesthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people." As part of the declaration of rights embraced by Article

---

[1] The amendment received 1,021,342 votes: more than any candidate seeking state-wide office.

I, the amendment confers certain enumerated rights upon the people of the Commonwealth and imposes upon the executive branch a fiduciary obligation to protect and enforce those rights.

If the amendment was intended only to espouse a policy undisposed to enforcement without supplementing legislation, it would surely have taken a different form. But the amendment is not addressed to the General Assembly. See, *e.g.*, *Coatesville Gas Co. v. Chester County*, 97 Pa. 476 (1881). It does not require the legislative creation of remedial measures. Instead, the amendment creates a public trust. The "natural, scenic, historic and aesthetic values of the environment" are the trust *res;* the Commonwealth, through its executive branch, is the trustee; the *people of this Commonwealth* are the trust beneficiaries. The amendment thus installs the common law public trust doctrine *as a constitutional right to environmental protection* susceptible to enforcement by an action in equity.

The majority relies on constitutional amendments of Massachusetts, Illinois, New York and Virginia to support its holding that Section 27 is not self-executing. The Court finds it "significant that all of these other states, which expanded the powers of their governments over the natural environment in the same way as Article I, Section 27 expanded the powers of the Commonwealth, recognized that legislative implementation was necessary before such new power could be exercised." I find no significance in the fact that the constitutional provisions of these several jurisdictions are not self-executing for it is evident to me that each of the cited amendments is materially distinguishable from Article I, Section 27. Each of these amendments purports to establish a policy of environmental protection, but either omits the mode of enforcement or explicitly delegates the responsibility for implementation to the legislative

branch.[2] The Pennsylvania amendment defines enumerated rights within the scope of existing remedies. It imposes a fiduciary duty upon the Commonwealth to protect the people's "right to clean air, pure water and to the preservation of the natural, scenic, historic and aesthetic values of the environment." That the language of the amendment is subject to judicial interpretation does not mean that the enactment must remain *an ineffectual constitutional platitude* until such time as the legislature acts.

Because I believe Article I, Section 27 is self-executing, I believe that our inquiry should have focused upon the ultimate issue of fact: does the proposed tower violate the rights of the people of the Commonwealth as secured by this amendment?

The chancellor's determination that the erection of the tower would not be injurious to the environmental values protected by Article I, Section 27 was not a "finding of fact," but a conclusion of ultimate fact based upon inferences drawn from the evidence presented at trial. The Commonwealth Court refused to review the chancellor's findings absent a showing of abuse of discretion. *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Commonwealth Ct. 231, 247, 302 A. 2d 886, 894 (1973). The application of the "abuse of discretion" standard in this context is error. This Court has held on numerous occasions that, although a chancellor's findings of fact have the force and effect of a jury's verdict, the chancellor's conclusions of ultimate fact are reviewable. *Shapiro v. Shapiro*, 424 Pa. 120, 224 A. 2d 164 (1966) ; *Chambers v. Chambers*, 406 Pa. 50, 176 A. 2d 673 (1962) ; *Sechler v. Sechler*, 403 Pa. 1, 169 A. 2d 78 (1961) ; *Commonwealth Trust Co. v. Szabo*, 391 Pa. 272, 138 A. 2d 85 (1958) ; *Peters v. Machikas*, 378 Pa. 52, 105 A. 2d 708

---

[2] See footnotes, 5, 6, 7 and 8 of the majority opinion.

(1954). As long as we give full weight to the chancellor's findings of fact, we are free to draw our own inferences and conclusions from the facts as found.

The facts indicate that the proposed tower is a metal structure rising 310 feet above the ground. It is shaped like an hourglass: about 100 feet in diameter at the bottom, 30 feet in the middle and 70 feet at the top. The top level will include an observation deck, elevator housings, facilities for warning approaching aircraft and an illuminated American flag. The proposed site of the tower is an area around which the third day of the battle of Gettysburg was fought. It is located immediately south of the Gettysburg National Cemetery.

The Commonwealth presented compelling evidence that the proposed observation tower at Gettysburg would desecrate the natural, scenic, aesthetic and historic values of the Gettysburg environment.

The director of the National Park Service, George Hartzog, appeared as a witness for the Commonwealth in the stead of United States Secretary of the Interior Rogers Morton. Mr. Hartzog testified with respect to a 1970 meeting at which Thomas Ottenstein, appellee, first presented the tower concept to the Park Service:[3]

---

[3] Mr. Hartzog also testified with respect to the Federal Government's motive behind the Ottenstein-Park Service agreement giving this entrepreneur a right of way over federal land to the tower site: "Q. Did the Park Service, under your direction, ever directly, indirectly sanction the construction of the tower at any location in Gettysburg? A. We did not. Q. What was the purpose of the Department of the Interior and the Park Service entering into the agreement? A. It simply said if you will move this tower from Colt Park to the Stonehenge Site we will give you a right-of-way over Federally owned property between the parking lot and where this new site is. Q. And what was the purpose of the Interior Department in entering into that agreement? A. To minimize to the extent that we could, within the authorities available to us, the adverse impact of this tower on Gettysburg Park."

"I described it as a monstrosity. I advised Mr. Otten-
stein that between all of the mistakes which I felt the
federal government had made here, and all of the mis-
takes I felt the commercial interests had made here,
nevertheless Gettysburg remained a very sacred symbol
to the more than 200,000,000 people across the United
States, and that an intrusion of this immensity would,
in our judgment, be an absolute monstrosity in this
kind of environment and I was very much opposed to
it."

Mr. Hartzog offered eloquent testimony on the
question of the tower's impact upon the Gettysburg
environment: "Q. Could you describe what you think
the impact will be? A. Well, I think you have got to
look at what is the battle of Gettysburg, and this is the
high point of the Confederacy. It was a battle of hu-
man scale. It was not a cataclysmic type of Army or
what you have today, so it is a human scale battle that
a visitor can become involved in, and through the in-
volvement can understand the tragedy and the pathos
and the death and destruction that took place there.
To put a tower 320 feet into this pastoral scene of hu-
man scale, a historical event, is just simply to destroy
any relationship between the human dimension of this
battlefield and this technological achievement of a
tower. Q. Would it, in your opinion, be possible to
measure the damage that would occur to this historic
site if that tower were erected? A. Well, I don't think
that you can measure these things in a normal system
of values that we articulate in terms of dollars and
cents. You measure them more in terms of matters of
integrity and understanding and inspiration and in-
volvement. And from this standpoint I think a mon-
strous intrusion such as this tower is, into the histori-
cal, pastoral scene of that battlefield park and Eisen-
hower National Site and the National Cemetery and
the place where Lincoln spoke, is just destructive of

the integrity of its historical value. Q. And you are saying you can't put a price tag on those values? A. No, you can't. There is one Yorktown and there is one Gettysburg, and these battlefields have great significance and to intrude this kind of monstrous structure into it is to destroy the whole environment of it."

Robert Garvey, the Executive Secretary of the President's Advisory Council on Historic Preservation also testified for the Commonwealth. Mr. Garvey authenticated the Commonwealth's exhibit documenting the Advisory Council's comments to the Secretary of the Interior respecting the Gettysburg tower. The exhibit reads in pertinent part as follows:

"The undertaking, an agreement to convey a right-of-way across parklands, cannot be evaluated apart from the proposed observation tower to which the right-of-way will give access. In this context and in terms of the Advisory Council's 'Criteria for Effect', the Undertaking will have an adverse effect upon Gettysburg National Military Park and Gettysburg National Cemetery, both National Register properties.

. . .

"The Council further recommends that the Department of the Interior immediately advise the Commonwealth of Pennsylvania that the agreement with the National Gettysburg Battlefield Tower, Inc., and Mr. Thomas R. Ottenstein was in no sense an approval of the tower at the Stonehenge Site or any other site, and that it do everything it can to assist the Commonwealth of Pennsylvania in its legal action to stop the construction of a tower at Gettysburg."

The Commonwealth also elicited the testimony of Louis Kahn, distinguished architect and Professor of Architecture at the University of Pennsylvania. Mr. Kahn testified that the proposed tower was not intended to be a monumental structure. It was intended rather to be functional, to provide its elevated observa-

tion platforms and to "disappear" upon visual contact. Mr. Kahn testified, however, that the tower will not "disappear"; but that because the tower will be constructed so out of scale with the battlefield, it will dominate the landscape causing everything to "cringe" beneath it.

Philadelphia architect Vincent Kling testified that the tower is inappropriate to the environment of Gettysburg because it will not blend into the natural surroundings of the area.

Pulitzer prize-winning Civil War historian Bruce Catton testified that the historical integrity of the area was delicate, and that the proposed tower would shatter the visitor's vicarious historical involvement in Gettysburg best experienced by a ground level observation of the area.

In juxtaposition to the eminent expert witnesses offered by the Commonwealth,[4] the appellees offered the testimony of three witnesses: (1) Harry Biesecker, an Adams County Commissioner, (2) Joel Rosenblatt, a civil engineer who designed the tower and (3) Dr. Mario Menesini, an educational consultant.

Mr. Biesecker testified that the proposed tower would be a significant commercial asset to Adams County and that a petition approving the construction of the tower had garnered 2200 signatures, about five per cent of the county's population. Mr. Rosenblatt testified that the tower was designed to educate its patrons and to stand as unobtrusively as possible. Dr. Menesini offered the opinion that the educational benefits of the tower with respect to the Battle of Gettysburg

---

[4] In addition to the witnesses mentioned, the Commonwealth called Thomas Harrison, Chief of the Resources Management Division of the Gettysburg National Military Park; Sylvester Stevens, Executive Director of the Pennsylvania Historic and Museum Commission; Robert Jansen, professor of physics at the Gettysburg Seminary; and others.

would be more advantageous than presently existing means of instruction on the subject.

The facts presented, even as construed in a light most favorable to the appellees, permit me only one conclusion: the proposed structure will do violence to the "natural, scenic, historic and aesthetic values" of Gettysburg. This Court's decision today imposes unhappy consequences on the people of this Commonwealth. In one swift stroke the Court has disemboweled a constitutional provision which seems, by unequivocal language, to establish environmental control by public trust and, in so doing, consequently sanctions the desecration of a unique national monument. I would enjoin the construction of this tower by the authority of Article I, Section 27 of the Pennsylvania Constitution.

I dissent!

Mr. Justice EAGEN joins in this dissenting opinion.