Commonwealth of Pennsylvania, Department of Environmental Resources, Appellant, *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, Harold D. and Catherine M. McCoy, Intervening Party-Appellants, The Potomac Edison Company, Intervening Appellee.

Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, *v.* Harold D. and Catherine M. McCoy, Appellants, The Potomac Edison Company, Intervening Appellee.

Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Appellee, *v.* Harold D. and Catherine M. McCoy, Appellants, The Potomac Edison Company, Intervening Appellee.

Argued February 3, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Dennis J. Harnish,* Special Assistant Attorney General, for appellant, Department of Environmental Resources.

*S. Berne Smith,* wth him *McNees, Wallace & Nurick,* for appellants, McCoy.

*Michael P. Kerrigan,* Assistant Counsel, with him *Peter Brown,* Counsel, for appellee, Pennsylvania Public Utility Commission.

*J. L. Doyle,* with him *Maxwell & Bridgers,* for intervening appellee.

OPINION BY JUDGE MENCER, April 10, 1975:

We have for our consideration three related appeals from two final orders of the Pennsylvania Public Utility Commission (Commission) approving applications and granting certificates of public convenience and necessity to The Potomac Edison Company (Potomac) for the right to proceed in eminent domain for an electric transmission line right-of-way across the Franklin County properties of George H. Barmont and Mildred R. Barmont (Barmont) and of Harold D. McCoy and Catherine M. McCoy (McCoy). The Barmont and McCoy properties are contiguous. Consolidated hearings were held on the two applications. Over objection by Potomac, the Commission permitted the Department of Environmental Resources (DER) to intervene in the proceedings relating to the McCoy property.[1]

The orders which are the subject of these appeals were both adopted August 6, 1974. DER appealed from the order relating to the McCoy property, and McCoy filed an appeal from each order.[2] We consolidated these three appeals for argument, and we affirm both orders of the Commission.

Potomac proposes to construct approximately 18.94 miles of electric transmission line on wooden pole H-frame structures. The proposed line would commence in Guilford Township, Franklin County, and terminate in Ayr Township, Fulton County, and would traverse over a proposed right-of-way which would cross the Barmont and McCoy properties. McCoy and DER do not contest the Commission's conclusions that there is a need for the proposed line.

---

1. The propriety of such intervention is not raised by any of the parties to these appeals. At oral argument the DER asserted, without the citing of authority, its standing to intervene. We do no decide the issue of standing, relative to DER, in this case.

2. McCoy had been permitted by the Commission to intervene in the Barmont proceeding.

The issues raised in these appeals relate to the selection of the line location as it affects the Barmont and McCoy properties, whether the proper standards were employed in evaluating the propriety of the route selected, and whether the evidence supports the Commission's conclusion to approve the route selected by Potomac.

The scope of our review is narrow. Our inquiry is as to whether the Commission's orders granting certificates of public convenience should be vacated or set aside for error of law or lack of supporting evidence or for violation of constitutional rights. Public Utility Law, Act of May 28, 1937, P. L. 1053, §1107, *as amended,* 66 P.S. §1437. We may not exercise our independent judgment on the record. *Clemmer v. Pennsylvania Public Utility Commission,* 207 Pa. Superior Ct. 388, 217 A. 2d 800 (1966). If there is substantial evidence in support of the order of the Commission, we may not set it aside. Substantial evidence is such relevant evidence as a reasonable mind can accept as adequate to support a conclusion.

As we stated in *Lesher v. American Telegraph and Telephone Company,* 1 Pa. Commonwealth Ct. 522, 525, 276 A. 2d 325, 326-27 (1971), when considering a companion and comparable act empowering telephone and telegraph companies to appropriate private real estate for the construction, erection, operation, or maintenance of their lines:

"The selection of the right-of-way is a matter for the public utility and will not be set aside unless the powers conferred upon the public utility are wantonly, capriciously or arbitrarily exercised. West Penn Power Co. v. Pennsylvania Public Utility Commission, 199 Pa. Superior Ct. 25, 184 A. 2d 143 (1962). The failure to select a route which would reduce the inconvenience to the landowners does not constitute grounds for withholding the exercise of

the power to condemn the easement. Stone v. Pennsylvania Public Utility Commission, 192 Pa. Superior Ct. 573, 162 A. 2d 18 (1960). In Schenck v. Pittsburgh, 364 Pa. 31, 36, 70 A. 2d 612, 614 (1950), we find the standard for the proper exercise of the power of eminent domain when the Court stated: 'It has been held in many cases that where the right of eminent domain is vested in a municipality, an administrative body, or even a private corporation, the question as to whether the circumstances justify the exercise of the power in a given instance is not a judicial one, at least in the absence of fraud or palpable bad faith.' "

In *Duquesne Light Company v. Upper St. Clair Township,* 377 Pa. 323, 338 n. 1, 105 A. 2d 287, 294 n. 1 (1954), it was stated:

" '. . . "Under a delegation of the power of eminent domain the grantee of the power, in the absence of legislative restriction, may determine the location of the land [to be] acquired, and such determination will not be interfered with by the courts if it is made in good faith and is not capricious or wantonly injurious, or in some respect beyond the privilege conferred by the charter or statute. The landowner cannot raise the objection that there is no necessity for condemning the property because some other location might be made". . .'."

We have read and studied the record and are convinced that the Commission's conclusion that the route selected by Potomac was reasonable was correct, and we find that the condemnation of the easement required was in accord with Potomac's right to appropriate private real estate under the provisions of Section 4 of the Act of May 8, 1889, P. L. 136, *as amended,* 15 P.S. §3272.

The record discloses that prior to final route selection Potomac studied the area's topography, evaluated terrain and contours, considered vegetation and land use,

considered alternative routes, evaluated each proposed route for compliance with federal government guidelines, analyzed each route's compatibility with system reliability, considered impact of proposed routes upon the environment, made safety and economic evaluations, calculated construction and maintenance costs, and conducted a detailed survey of the area to be affected by the route selected. There is simply no evidence in this record sufficient to support a conclusion that Potomac's final route selection was wanton, capricious, or made in palpable bad faith. Rather, it was based on a consideration of relevant and germane factors.

Although a witness for McCoy testified to four alternative routes which would place the electric transmission line approximately 400 feet to the rear of the McCoy farmhouse and outbuildings,[3] rebuttal testimony by Potomac established that each of these four suggested routes would entail additional construction costs, varying from $11,590 to $24,880, and would require additional rights-of-way from adjacent property owners and renegotiation with three property owners of already acquired rights-of-way.

Admittedly, there was testimony that indicated Potomac should have selected some other route but, as we have noted, the selection of the right-of-way is a matter for the public utility and will not be set aside unless the powers conferred upon the public utility are wantonly, capriciously, or arbitrarily exercised. This record does not disclose such exercise of powers by Potomac.

McCoy and DER further contend that the Commission erred in law in failing to evaluate Potomac's applications under Article I, Section 27, of the Pennsylvania Constitution. This constitutional provision declares that the people have the right to clean air, pure water, and

---

3. The route selected by Potomac would pass approximately 1100 feet to the front of the McCoy farmhouse.

to the preservation of the natural, scenic, historic and esthetic values of the environment and requires the Commonwealth as trustee to conserve and maintain the Commonwealth's natural resources.[4] We have held that this provision is self-executing. *Commonwealth v. National Gettysburg Battlefield Tower, Inc.,* 8 Pa. Commonwealth Ct. 231, 302 A. 2d 886 (1973), *aff'd,* 454 Pa. 193, 311 A. 2d 588 (1973).[5]

McCoy and DER argue here that it is the Commission's constitutional duty to proscribe this transmission line if it will have any effect on the interests enumerated in Article I, Section 27. Further, they assert that there is an affirmative burden on the Commission to represent the public interest and that it is the Commission's minimum duty to make a complete record by investigating all pertinent facts and to see that they are adduced of record when the parties before the Commission have not done so.

We do not conclude that such an affirmative duty rests with the Commission or that the absolute interpretation urged upon us here is required. Our awareness of the ramifications of such a stance caused us to point out in *Gettysburg* that "[i]t is difficult to conceive of any human activity that does not in some degree impair the natural, scenic and esthetic values of any environment. If the standard of injury to historic values is to be that expressed by the Commonwealth's witnesses as an 'in-

---

4. The McCoy farmhouse is alleged to be an historic site. The Commission determined that the route selected by Potomac would not endanger the "McCoy dwelling as a historic site."

5. In the Supreme Court's affirmance, by a 5-2 decision, four Justices expressed their views on the question of whether the provisions of Article I, Section 27 of the Pennsylvania Constitution are self-executing, and they were equally divided on this point. The three other Justices of the Court did not express opinions on this question but supported the affirmance on other considerations, thus reaching a majority result rather than a majority decision.

trusion' or 'distraction,' it becomes difficult to imagine any activity in the vicinity of Gettysburg which would not unconstitutionally harm its historic values." 8 Pa. Commonwealth Ct. at 249, 302 A. 2d at 895.

Our view of this difficult question was propounded in *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 29-30, 312 A. 2d 86, 94 (1973), when we stated the following:

> "We hold that [Article I] Section 27 was intended to allow the normal development of property in the Commonwealth, while at the same time constitutionally affixing a public trust concept to the management of public natural resources of Pennsylvania. The result of our holding is a controlled development of resources rather than no development.
>
> "We must recognize, as a corollary of such a conclusion, that decision makers will be faced with the constant and difficult task of weighing conflicting environmental and social concerns in arriving at a course of action that will be expedient as well as reflective of the high priority which constitutionally has been placed on the conservation of our natural, scenic, esthetic and historical resources.
>
> "Judicial review of the endless decisions that will result from such a balancing of environmental and social concerns must be realistic and not merely legalistic. The court's role must be to test the decision under review by a threefold standard: (1) Was there compliance with all applicable statutes and regulations relevant to the protection of the Commonwealth's public natural resources? (2) Does the record demonstrate a reasonable effort to reduce the environmental incursion to a minimum? (3) Does the environmental harm which will result from the challenged decision or action so clearly outweigh the benefits to be derived therefrom that to proceed further would be an abuse of discretion?"

The hearings held relative to the applications here did not have as their central focal point a recognition of

this standard. However, our application of this three-fold standard to the record before us in the instant case does not compel us to reverse the challenged orders of the Commission.

We hold to the view that the burden to affirmatively support an application for a certificate of public convenience rests upon the applicant. Since the adoption of Article I, Section 27, that burden has not shifted but, once the adverse impact of the certificate of public convenience sought by applicant upon the interests of Article I, Section 27, is raised by a protestant or intervenor, then the applicant's burden is intensified, and the Commission, in the first instance, and, in the event of appeal, the review court, must be satisfied that the three-fold standard enunciated in *Payne v. Kassab, supra,* is met.

Finding no abuse of discretion of error of law, we make the following

ORDER

AND Now, this 10th day of April, 1975, the Pennsylvania Public Utility Commission's orders adopted August 6, 1974, relative to The Potomac Edision Company, are hereby affirmed.

CONCURRING OPINION BY PRESIDENT JUDGE BOWMAN:

Again I must register my disagreement with majority view that the provisions of Article I, Section 27, of our Constitution are self-executing, as I did in *Payne v. Kassab,* 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973). I concur in the result reached and fully subscribe to the majority opinion in all other respects.

CONCURRING OPINION BY JUDGE KRAMER:

While I concur in the result reached by the majority and agree with the reasoning of the thorough opinion of

568

my brother, JUDGE MENCER, I respectfully must dissent from that portion of the opinion which states that Article I, Section 27 of the Pennsylvania Constitution of 1968 is self-executing. I recognize that I have concurred in other opinions wherein this Court has so held,[1] but upon further reflection I now believe that the holding is wrong.

My attempts to deal with and decide cases such as the instant case have led me to believe that Article I, Section 27 should not be held to be self-executing, for the reasons set forth by JUSTICE O'BRIEN in *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588 (1973).[2] This case highlights the reason why Article I, Section 27 should not be held to be self-executing. The majority's holding concerning burden of proof is as follows:

> "We hold to the view that the burden to affirmatively support an application for a certificate of public convenience rests upon the applicant. Since the adoption of Article I, Section 27, that burden has not shifted but, once the adverse impact of the certificate of public convenience sought by applicant upon the interests of Article I, Section 27, is raised by a protestant or intervenor, then the applicant's *burden is intensified*, and the Commission, in the first instance, and, in the event of appeal, the review court, must be satisfied that the threefold standard enunciated in *Payne v. Kassab, supra*, is met." (Emphasis added.)

I believe the majority's holding will bring nothing but confusion and harassment to a myriad of future property developments throughout this Commonwealth. Anyone

---

1. *See Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 8 Pa. Commonwealth Ct. 231, 302 A.2d 886 (1973), *aff'd.* 454 Pa. 193, 311 A.2d 588 (1973) and *Payne v. Kassab*, 11 Pa. Commonwealth Ct. 14, 312 A.2d 86 (1973).

2. As is noted in the majority opinion, the Supreme Court divided equally in *Gettysburg Tower* on the question of whether Article I, Section 27 is self-executing.

who is adverse to any kind of project or construction will be able to pick up the battle cry, "Article I, Section 27," and immediately the real merits of the case will be transformed into a hyperbolic discussion of what is "clean air, pure water, and the preservation of the natural, scenic, historic and aesthetic values of the environment," and what constitutes "a reasonable effort to reduce the environmental incursion to a minimum." Anyone interested in opposing any kind of project will be able to harass and perhaps even thwart what may be a perfectly legitimate development, by shouting the battle cry. According to the majority, the proponents of protecting the environment have no burden of proving the project in fact violates Article I, Section 27, or even that they are sincere in their opposition,[3] for upon hearing the magical words, the burden immediately is placed, according to the majority, upon the project or construction developer to "intensify" his efforts of proving not only that his project is in compliance with the applicable law, but also that his project does not violate the environment. At that point in the proceedings, the project developer will be forced to guess the standards he must meet to prove that his project does not harm the environment. It seems to me that anyone who wants to challenge a project on the basis of Article I, Section 27, should bear the burden of proving that the proposed project will in fact violate the

---

3. There is testimony in this record, by an expert witness for McCoy, concerning the possibility of future developments on the McCoy property. The witness testified that the property is "attractive" for future development, particularly for residential development but also perhaps for some limited commercial or industrial development. The witness testified that the proposed power line would have a "disastrous" effect on future development of the property. This witness' testimony raises a question in my mind concerning whether the McCoys are primarily interested in protecting the historical significance of their farm or in protecting the aesthetic value of their entire tract in order to protect its value for future proprietary development.

constitutional provision. Once again, however, we would be confronted with the problem of determining by what standards it would be determined that that burden of proof was met. I believe that until the Legislature implements Article I, Section 27, by establishing standards, which can be equally and fairly applied to all of our citizens, no one, whether the developer of a project or an opponent, will be protected, because no one will be able to determine with any certainty what the law is in this area.

In the absence of any standards set forth by the Legislature, I do not believe this Court had any choice but to apply the type of balancing standards that we applied in *Payne, supra.* I do not believe, however, that the balancing test set forth in *Payne, supra,* can substitute for the more precise standards which could be set forth by the Legislature. The problem with a balancing test in this area of the law is that no one can translate environmental harm into a dollar and cents figure. In the absence of any prescribed standard to weigh or value environmental harm, it is really impossible to have a meaningful balancing test.[4] I do not believe our balancing test is really anything more than a "shock the conscience of the court test." In the absence of more precise standards or guidelines, we can really do no more than proceed on a case-by-case basis, and decide each case on the basis

---

4.  The record in *Gettysburg Tower, supra,* contains testimony by the director of the National Park Service. When asked if it was possible to measure the damage which the tower would have on the battlefield site, the director answered as follows:

> "Well, I don't think that you can measure these things in a normal system of values that we articulate in terms of dollars and cents. You measure them more in terms of matters of integrity and understanding and inspiration and involvement."

I have great difficulty applying a balancing test when I have to place dollars and cents on one side of the scales and integrity, understanding, inspiration and involvement on the other side.

of whether or not the proposed development offends our own personal ideas concerning environmental values. Instead of applying any set law or standards to these cases, we will merely be applying our own personal standards (or biases) concerning environmental values. I do not believe that this is proper and it may very well be in violation of the due process and equal protection clauses of the United States Constitution. In *Gettysburg Tower, supra,* JUSTICE O'BRIEN pointed out the constitutional problems involved in applying Article I, Section 27, in the absence of any standards:

> "After all, 'clean air' 'pure water' and 'the natural, scenic, historic and esthetic values of the environment,' have not been defined. The first two, 'clean air' and 'pure water,' require technical definitions, since they depend, to some extent, on the technological state of the science of purification. The other values, 'the natural, scenic, historic and esthetic values' of the environment are values which have heretofore not been the concern of government. To hold that the Governor needs no legislative authority to exercise the as yet undefined powers of a trustee to protect such undefined values would mean that individuals could be singled out for interference by the awesome power of the state with no advance warning that their conduct would lead to such consequences.

> "If we were to sustain the Commonwealth's posision that the amendment was self-executing, a property owner would not know and would have no way, short of expensive litigation, of finding out what he could do with his property. The fact that the owner contemplated a use similar to others that had not been enjoined would be no guarantee that the Commonwealth would not seek to enjoin his use. Since no executive department has been given authority to determine when to move to protect the environment,

there would be no way of obtaining, with respect to a particular use contemplated, an indication of what action the Commonwealth might take before the owner expended what could be significant sums of money for the purchase or the development of the property.

"We do not believe that the framers of the environmental protection amendment could have intended such an unjust result, one which raises such serious questions under both the equal protection clauses and the due process clauses of the United States Constitution. In our opinion, to insure that these clauses are not violated, the Legislature should set standards and procedures for proposed executive action." (Footnotes omitted.) 455 Pa. at 202-203, 311 A.2d at 593-594.

In any event, I fully agree with the result of the majority opinion but feel constrained to add these words dissenting from the holding that Article I, Section 27 is self-executing and the holding that a developer's burden intensifies after the mere mention by any party of the magical words "Article I, Section 27."