Delaware Riverkeeper Network, :
Clean Air Council, David Denk, :
Jennifer Chomicki, and Joann Groman, :
 :
   Appellants :
 :
   v. : No. 2609 C.D. 2015
 : Argued: June 6, 2019
Middlesex Township Zoning :
Hearing Board :
 :
   v. :
 :
PennEnergy Resources, LLC, :
Middlesex Township, and :
Robert G. Geyer :

BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge (P)
    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK       FILED: June 26, 2019

   This is an appeal by Objectors[1] from the order of the Butler County Court of Common Pleas (trial court) denying their appeal of the Middlesex Township (Township) Zoning Hearing Board's (Board) decision that denied their substantive challenge to the Township's Ordinance 127 and denied their appeal of

---

   [1] The Objectors are the Delaware Riverkeeper Network (DRKN), the Clean Air Council (CAC), and David Denk, Jennifer Chomicki, and Joann Groman, landowners in Weatherburn Heights Planned Residential Development in Middlesex Township near the well site.

the zoning permit that the Township issued to R.E. Gas Development, LLC (Rex).[2] Initially, this Court affirmed the Board's decision. *See Delaware Riverkeeper Network v. R.E. Gas Development, LLC* (Pa. Cmwlth. Nos. 1229 C.D. 2015, 1323 C.D. 2015, 2609 C.D. 2015, filed June 7, 2017) (*Delaware Riverkeeper I*).[3]

The matter returns to this Court on remand from the Pennsylvania Supreme Court pursuant to the following order:

> **AND NOW**, this 3rd day of August, 2018, the Petition for Allowance of Appeal is **GRANTED**. The Order of the Commonwealth Court is **VACATED** and this matter is **REMANDED** to Commonwealth Court for reconsideration of its decision in light of *Pa. Envtl. Def. Found. v. Commonwealth*, 161 A.3d 911 (Pa. 2017) [(*PEDF II*)]. In addition, in light of the amendments contained in Middlesex Township Ordinance 127, which expressly include gas well development as a permitted use in the subject R-AG zone, and our decision in *Gorsline v. Bd. of Sup. of Fairfield Twp.*, [186 A.3d 375 (Pa. 2018) (*Gorsline II*)] wherein we noted "this decision should not be misconstrued as an indication that oil and gas development is never permitted in residential/agricultural districts, or that it is fundamentally incompatible with residential or agricultural uses," we direct Commonwealth Court to reconsider the relevance of *Gorsline* to its analysis of the issues on appeal in this case.

---

[2] By January 25, 2019 order, we granted the application of PennEnergy Resources, LLC (PennEnergy) to be substituted as appellee for Rex. Nevertheless, for the sake of clarity, we will continue to refer to the relevant appellee as Rex rather than PennEnergy.

[3] We also dismissed as moot stay orders issued by the trial court in our prior memorandum opinion and order in *Delaware Riverkeeper I*, which are not at issue in the instant remand proceedings.

*Delaware Riverkeeper Network v. Middlesex Township Zoning Hearing Board*, 190 A.3d 1126-27 (Pa. 2018) (*Delaware Riverkeeper II*) (emphasis in original).[4] Upon reconsideration, we again affirm the Board's order.

## I.

The facts of this case, as outlined in *Delaware Riverkeeper I*, are as follows. Robert G. Geyer (Geyer) owns farm property along the south side of the east-west Route 228 corridor in the Township near its boundary with Adams Township, which is near the Weatherburn Heights (Weatherburn) Planned Residential Development (PRD). In November 2012, the Township's Board of Supervisors enacted Ordinance 125 creating an R-AG Residential Agriculture Zoning District, a mixed-use district, to limit suburban growth and the location of PRD developments from a majority of the zoning districts in the Township.[5] The

---

[4] As this Court has explained:

> "[I]t has long been the law in Pennsylvania that following remand, a lower court is permitted to proceed only in accordance with the remand order." *Commonwealth v. Sepulveda*, [144 A.3d 1270, 1280 n.19 (Pa. 2016)]. In *Levy v. Senate of Pennsylvania*, 94 A.3d 436 (Pa. Cmwlth.), *appeal denied*, [] 106 A.3d 727 (Pa. 2014), which the Supreme Court cited with approval in *Sepulveda*, this Court explained: "Where a case is remanded for a specific and limited purpose, 'issues not encompassed within the remand order' may not be decided on remand. A remand does not permit a litigant a 'proverbial second bite at the apple.'" *Levy*, 94 A.3d at 442 (quoting *In re Indep. Sch. Dist. Consisting of the Borough of Wheatland*, 912 A.2d 903, 908 (Pa. Cmwlth. 2006)).

*Marshall v. Commonwealth*, 197 A.3d 294, 306 (Pa. Cmwlth. 2018).

[5] Ordinance 125 added Section 175-243 to the Township's Zoning Ordinance, which states that the purpose of the R-AG Zoning District "is to provide for agricultural uses, low-
**(Footnote continued on next page…)**

Geyer farm is located in the R-AG Residential Agriculture District and Rex has leased the oil and gas underlying Geyer's property.

In August 2014, the Township's Board of Supervisors enacted Ordinance 127, over the objection of the Township's Planning Commission. Ordinance 127 states that the "Township Zoning Ordinance as currently written does not expressly provide for the use or regulation of oil and gas operations," and the "Township Board of Supervisors desires to expressly provide for the use and regulation of oil and gas operations within the Township." Reproduced Record (R.R.) at 34a. Ordinance 127 allows for "oil and gas well site development" as a permitted principal and accessory use in the AG-A Rural Residential District;[6] AG-

---

**(continued…)**

density residential development and planned higher density development in areas where the general character is defined by rural areas which are in close proximity to major roads, infrastructure and areas near existing concentrated residential development and to provide for compatible public, semipublic and accessory uses as conditional uses or uses by special exception." Reproduced Record (R.R.) at 1760a. Ordinance 125 also added Section 175-244(A)(1) to the Zoning Ordinance that provided the following permitted principal uses in the R-AG Residential Agriculture District: farms; greenhouse or tree nursery; single-family dwellings; two-family dwellings; government buildings; municipal firehouses; schools; public utilities, except buildings; and municipal recreation. *Id.*

[6] Ordinance 127 added the definition of "oil and gas well site development" to Section 175-8 of the Township's Zoning Ordinance, which is defined as "well location assessment, including seismic operations, well site preparation, construction, drilling, water or fluid storage operations, hydraulic fracturing and site restoration associated with an oil and gas well of any depth," "includ[ing] conventional (vertical) and non-conventional (horizontal) methods of drilling." R.R. at 35a. Ordinance 127 also added Section 175-155.2 to the Zoning Ordinance which imposes a number of restrictions and requirements with respect to oil and gas well site development including: a 10-acre minimum lot size; compliance with state and federal regulations; access roads; traffic safety; dust control measures; noise standards; light restrictions; water storage requirements; limits to times of operation; signage and site identification; and any other restrictions necessary for the grant of a conditional use. *See* R.R. at 38a-45a.

4

B Agricultural District; I-1 Restricted Industrial District; and the R-AG Residential Agriculture District; and as a conditional use in the C-2 Highway Commercial District; TC Town Center District; and C-3 Regional Commerce District. Ordinance 127 provides natural gas compressor stations as a permitted use in the I-1 Restricted Industrial District and as a conditional use in the AG-A Rural Residential District; AG-B Agricultural District; C-2 Highway Commercial District; TC Town Center District; and C-3 Regional Commerce District. The ordinance also provides natural gas processing plants as a conditional use in the I-1 Restricted Industrial and C-3 Regional Commerce Districts. *See* R.R. at 48a.

In September 2014, the Pennsylvania Department of Environmental Protection (DEP) issued well permits for drilling on the Geyer farm (Geyer site). The Township also granted Rex's application for a zoning permit for the drilling.

In October 2014, Objectors filed a substantive validity challenge to Ordinance 127 and an appeal of the zoning permit, which the Board consolidated for disposition.[7] In the substantive validity challenge, Objectors claimed that Ordinance 127: (1) violates Article 1, Section 1 of the Pennsylvania Constitution[8] because it was not designed to protect the health, safety, morals, and public welfare of its citizens and, therefore, is not a valid exercise of the Township's police power; (2) violates Article 1, Section 1 by injecting incompatible industrial uses into a non-industrial zoning district in violation of the Township's Comprehensive

---

[7] Rex and MarkWest Liberty Midstream & Resources (MarkWest), a natural gas gathering, processing and transportation company, intervened in the proceedings.

[8] Article 1, Section 1 states, in relevant part, that "[a]ll men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property . . . and of pursuing their own happiness." Pa. Const. art. I, §1.

Plan thereby making the ordinance irrational; and (3) unreasonably infringes on their rights under Article 1, Section 27 of the Pennsylvania Constitution (Environmental Rights Amendment)[9] to clean air, pure water, and a healthy local environment in which to live, work, recreate, and raise their children.[10]

The Board held nine public hearings at which the parties presented expert and lay testimony and evidence. Development at the Geyer site was stayed during the proceedings.

David Denk, one of the Objectors and a member of DRKN and CAC, testified that he lives in Weatherburn with his wife and two children approximately 1200 feet from the Geyer site. He stated that he did not expect industrial activity from a well pad at the Geyer site when he purchased his house and he did not check with the Township to see if a well site was a permitted use. He said that he had retained the mineral rights in his property, but that he had concerns about the

---

[9] Article 1, Section 27 states:

> The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. art. I, §27.

[10] In their appeal of the zoning permit issuance, Objectors raised similar claims, asserting that the Township's approval of the Geyer site well pad development: (1) violates their rights under Article 1, Section 1 by injecting an incompatible industrial use with industrial standards into a zoning district where there is no expectation of industrial activity and where it will cause a nuisance; (2) violates their rights under Article 1, Section 27 to a healthy community in which to live; and (3) breached the Township's obligations as trustee under Article 1, Section 27.

health impact of fracking activities if they take place nearby. The Board accepted Denk's testimony as credible.

Robert Zaccari, a member of DRKN and CAC, testified that in 2011, he purchased his house in Weatherburn and understood that the area is zoned for residential and agricultural uses. He acknowledged that residential construction in Weatherburn has been ongoing since he moved there, but that well pad construction is more intense. He stated that he did not know that the Township has a noise ordinance and that he refused to lease his subsurface rights to Rex. He said that he is concerned that well pad activity will impact the future value of his home, but he did not know to what extent. The Board accepted Zaccari's testimony as credible.

Kathleen Wagner lives on Denny Road in the Township and is opposed to the well pad at the Geyer site. However, she stated that she signed a gas lease with Rex under which she was paid by Rex. As a result, the Board found the remainder of her testimony to be not credible.

Henrich Hartge testified that he resides in Weatherburn with his wife and daughter and that he is most worried about an explosion from fracking activities. The Board found that his concern, although not entirely outside the realm of possibility, was exaggerated for purposes of the hearing and not credible.

Crystal Yost testified that she lives with her husband and children approximately 1300 feet from an operating Rex fracking facility, the Reno well. The Board found that her testimony was not credible because she substantially exaggerated her testimony and was evasive.

Melissa Brown testified that she resides with her husband and daughter on Forsyth Road adjacent to an oil and gas pipeline. She stated that she

has concerns about the pipeline near the rear of her property contaminating the environment, her water well and her trees. However, she signed a subsurface gas lease with Rex and the Board found her testimony to be not credible.

Michael Endler, Rex's vice president and regional manager, testified regarding the construction activities and the timetable for the construction of a well pad. However, the Board found that his testimony was not credible because he was combative and evasive on cross-examination.

Jane Hawkins Peterson testified that she lives in the Township with her husband and is a part owner of a farm property that is leased to Rex and also to MarkWest for a pipeline. She stated that leasing the land for oil and gas financially helps her property remain agricultural, as opposed to being developed for residential uses. The Board accepted her testimony as credible.

Catherine Morely testified that she resides in the Township and her father's farm is the site of an existing Rex well pad, the Ferree well site. She stated that she lives 1900 feet from the Reno well site and 1900 feet from the Ferree well site. She said that her family's farming operations continue around the Ferree well site and the intrusion of the well pad drilling and construction was minimal. The Board accepted her testimony as credible.

Janice Kennedy testified that she lives adjacent to Weatherburn and would be approximately 1,015 feet from the Geyer well pad, the closest residence to the pad. She said that she began residing in the area before residential construction in Weatherburn, and that there has been ongoing construction from 2010. She stated that she considers the residential development to be a greater concern than the Geyer well pad due to increased lighting, ongoing construction, and denser population. She acknowledged that she has a subsurface lease with Rex

8

and that she has no objection to the construction of the well pad and fracking for gas and oil at the Geyer site. The Board accepted her testimony as credible.

Scott Fodi (Fodi), the Township's manager and zoning officer, testified that the Township's Zoning Ordinance was silent as to oil and gas facilities prior to the enactment of Ordinance 127 so the Township was at risk for such facilities being permitted in every district due to exclusionary zoning. He stated that oil and gas leasing reached a peak in intensity in the Township around the time the General Assembly enacted the Pennsylvania Oil and Gas Act (Act 13), 58 Pa. C.S. §§2301-3504, and that 80% of the properties in the Township are now leased for oil and gas development. He said that after this Court held that the zoning provisions in Act 13 were invalid in *Robinson Township v. Commonwealth*, 52 A.3d 463 (Pa. Cmwlth. 2012) (*Robinson I*), *aff'd in part and rev'd in part*, 83 A.3d 901 (Pa. 2013) (*Robinson II*), the Township's Board of Supervisors directed him to develop an oil and gas development zoning ordinance for the Township. He testified that he submitted the draft ordinance to the Township's Planning Commission in June 2014. He stated that, in July 2014, the Planning Commission voted to request the Board of Supervisors to postpone a vote on the draft ordinance for one month, but that the Board enacted Ordinance 127 in August 2014, nonetheless. The Board accepted his testimony as credible.

Thomas Daniels (Daniels), Objectors' land use expert, asserted that Ordinance 127 is not valid because it is not consistent with the Township's current joint Comprehensive Plan with Richland Township.[11]    He calculated that

---

[11] Objectors also offered Jay Parrish as an expert in geology and geography. However, the Board found that "Dr. Parrish's methodology is not generally accepted in the relevant field" and that "he admitted that the opinion he was offering is not supported by any scholarly support and is indeed 'novel.' [R.R. at 1911a]." *Id.* at 1773a. As a result, the Board determined that **(Footnote continued on next page…)**

9

Ordinance 127 opens up 90.2% of the Township to oil and gas development, but he did not provide a basis for this calculation. He opined that oil and gas operations constitute a heavy industrial use associated with noise, odor, dust, pollution, fires and evacuations, which is inconsistent with the residential and agricultural uses in the R-AG Zoning District.

Attorney William Sittig (Sittig), the Township's and Rex's land use expert,[12] asserted that oil and gas operations include industrial components but cannot be characterized as a heavy industrial use. He opined that Daniels only focused on a temporary period of industrial development and did not consider the entire lifespan of a well pad during drilling operations and the post-reclamation period. He disputed Daniels' assertion regarding breadth of development, stating that less than 30% of the land in the Township can be drilled pursuant to Ordinance 127. With respect to the Township's Comprehensive Plan, Sittig asserted that the issue is whether Ordinance 127 is a valid exercise of Township power and not

---

**(continued…)**

"[Objectors] failed to lay a proper foundation to establish the acceptance of [] Parrish's methods and conclusions," "decline[d] to accept [] Parrish as an expert," and "rejected [his testimony] *in toto*." *Id.*

[12] The Board noted that Sittig "has a Bachelor's Degree in mechanical engineering as well as a Juris Doctor[]," that "[h]e has extensive experience in land use planning issues as counsel for both municipalities and developers," and that "[h]is methodology is generally accepted in the field." R.R. at 1773a. The Board stated that "[t]he issue with Mr. Sittig is whether he can 'bring to the table' specialized knowledge beyond the scope of a layperson" and that "[a]s a general rule, expert testimony on questions of law is not permitted." *Id.* (citations omitted). Nevertheless, the Board accepted Sittig as an expert explaining that "during closing, counsel for [CAC] relied on, in large part, the testimony of Attorney Sittig in support of its own case, thereby waiving its objection," and "reserve[d] to itself . . . any decision as to questions of law." *Id.* at 1774a.

10

whether it fell within the plan's framework. The Board accepted Sittig's testimony as credible.

Daniel Carpenter (Carpenter), Objectors' public health expert, opined that there is a public risk for significant contamination by pollutants within a two-mile radius of a well pad based on his examination of studies relevant to fracking. However, the Board found that his opinion is based on flawed data and failed to take into account contrary studies.

Julie Panko (Panko), Rex's expert in human health risk assessments, conducted a study of the fracking operations at Fort Cherry High School in Washington County, from which she determined that the release of chemical pollutants into the air during fracking and flaring do not significantly exceed the background concentrations or health-based exposure limits. She opined that the oil and gas production authorized by Ordinance 127 does not constitute a risk to public health or neighboring residents, contradicting Carpenter's opinion. However, the Board found that her studies did not consider a number of emission sources and failed to include a variety of pollutants caused by gas development including contaminant volatile organic chemicals.

Dana Bowen (Bowen), Objectors' expert in noise assessment, prepared a study in which she concluded that the predicted noise levels would be 65 to 75 dBa at the Geyer site and would not reach 60 dBa for a distance of 3,200 feet from the site. She opined that sound mitigation techniques such as barriers would not effectively mitigate the noise. However, the Board found that she did not undertake any noise measurements at the Geyer site, did not accurately locate the position of the proposed well pad, and assumed that all equipment would be running simultaneously from the same spot and not arrayed across the site.

11

Ultimately, the Board rejected the expert testimony of Carpenter, Panko, and Bowen, stating that "[i]t is apparent from cross-examination that of these three scientific expert witnesses, each failed to take into account underlying data that did not support their conclusions, chose to take shortcuts in their research by only utilizing favorable data and overlooked or substantially downplayed inconvenient data." R.R. at 1784a-1785a. As a result, the Board found that "Dr. Carpenter, Ms. Panko and Ms. Bowen are not credible witnesses." *Id.* at 1785a.

In disposing of Objectors' claims, the Board initially explained that the Township's Board of Supervisors is granted the authority to amend its Zoning Ordinance under Section 601 of the Municipalities Planning Code (MPC)[13] and that Section 603(i) provides that "zoning ordinances shall provide for the reasonable development of minerals in each municipality." 53 P.S. §10603(i). In turn, Section 107 of the MPC defines "minerals" as including "crude oil and natural gas." 53 P.S. §10107. The Board also stated that under Section 603(g) and (h) and Section 604(5) of the MPC, "[z]oning ordinances must protect 'prime agricultural land' and encourage the continuity, development and viability of agricultural operations while also accommodating reasonable overall community growth. 53 P.S. §§10603(g) and (h), 10604(5)." R.R. at 1789a. The Board rejected "Daniels' view that oil and gas operations should be limited to industrial districts" because "it views residential as the preeminent use, to which all other uses are subordinate." *Id.* Rather, the Board found Sittig's testimony to be more persuasive and credible that "the need to balance interests and uses is a far better

---

[13] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10601. Section 601 states that "[t]he governing body of each municipality . . . may enact, amend and repeal zoning ordinances to implement comprehensive plans and to accomplish any of the purposes of this act."

view of a mixed-use zoning district, [which is] one of the aims of the MPC and indeed the balance spoken of in Article 1, Section 27 of the Pennsylvania Constitution." *Id.*

The Board explained:

> The Township Supervisors, through the passage of Ordinance 127, view oil and gas drilling activities as a way to help preserve agricultural activity. Their view is supported by the competent expert testimony of [] Sittig and the lay testimony of [] Morley and [] Hawkins Peterson. The Supervisors also view unchecked suburban growth as being associated with air and water pollution, traffic issues, and sewer and water costs. Where [Objectors] view agriculture and residential to be nearly synonymous, with a perspective that favors residential, the Supervisors do not, instead viewing residential and agricultural as distinct and different uses in a mixed-use district that must be balanced. The [Board] finds the Supervisors' view, espoused through the passage of Ordinance 127, to be credible.

R.R. at 1789a-1790a.

The Board found that "[t]he answer to whether the temporary industrial use poses a danger to the health, safety and welfare of the residents of [the] Township remains unanswered by the woefully inadequate scientific expert testimony presented in this case." R.R. at 1790a. The Board concluded that Objectors "failed to prove a health hazard to the community by their use of woefully inadequate scientific testimony" and, "[t]o the extent [that they] seek to limit oil and gas operations to a traditional industrial zone, the net effect would be to engage in the exclusionary zoning of oil and gas." *Id.*

The Board rejected Objectors' assertion that Ordinance 127 conflicts with the Township's Comprehensive Plan, concluding that "oil and gas operations are not specifically mentioned within the Comprehensive Plan" and that it "does

13

not refer to the evaluation and development of [an] approval process for the production of natural resources." R.R. at 1791a. To the extent that they are inconsistent, the Board asserted that "a comprehensive plan is an abstract recommendation as to land utilization" so that "inconsistency with a comprehensive plan . . . cannot be a basis for a substantive challenge to a zoning ordinance." *Id.* (citations omitted). The Board stated that it "does not view *Robinson, supra,* [sic] as reversing prior case law on this issue" or "to require absolute adherence to an adopted comprehensive plan." *Id.*

Regarding Article 1, Sections 1 and 27, the Board explained that "[t]he substantive due process inquiry requires a balancing of [landowners'] rights and the public interest to be protected by the exercise of the police power" and that "[t]his balancing of interests is the same inquiry that must be made to determine whether an ordinance meets [the] requirements of Trustee [under Section 27]." R.R. at 1792a. The Board found that "[t]he totality of oil and gas drilling on a site, such as the Geyer [site], is not an industrial use, but it is instead a use traditionally exercised in agricultural areas, containing [temporary] components of an industrial use" and that "[t]o limit oil and gas drilling activities to a traditionally zoned industrial district based on their industrial incidents, is irrational." *Id.* at 1793a.

The Board explained that the Township's Supervisors "balanced the community's costs and benefits of oil and gas production as evidenced by, on one hand, Ordinance 127's exclusion of oil and gas activity from 'purely' residential zones, such as R-1, R-2 and PRD districts, to on the other hand, viewing oil and gas drilling as part and parcel of an agricultural district." R.R. at 1792a.[14] The

---

[14] The Board determined that Ordinance 127 properly balanced these interests:

**(Footnote continued on next page…)**

14

Board noted the PRD overlay located in the R-AG Residential Agriculture District and that "[m]ixed use districts, and even seemingly incompatible mixed-use districts with crowded residential areas, have been recognized as an acceptable planning tool." *Id.* (citation omitted). The Board stated:

> In mixed use districts of residential and agricultural districts, such as the epicenter R-AG district, it is rational to preserve agricultural districts to maintain a check on the growth of residential districts. Oil and gas drilling provides a financial mechanism by which the free market can preserve agriculture. Ordinance 127 therefore bears a substantial relationship to public health, safety and welfare as well as a balancing of interests.

*Id.* at 1793a-1794a.

The Board found that the burden was on Objectors and that they "failed to meet their burden that oil and gas drilling pads will injure their neighbors." R.R. at 1794a. The Board stated that the Township's Supervisors "acted in their role as trustee for future generations, as required by Article 1, §27 . . . by helping to preserve agricultural resources for future generations." *Id.*

---

**(continued…)**

> Oil and gas activities are specifically excluded by Ordinance 127 from exclusively zoned residential districts, be it R-1, R-2 or within any PRD overlay district. The exclusion encompasses the three components of oil and gas drilling – well pads, processing plants and compressor stations. In addition, compressor stations and processing plants are not permitted in the R-AG district. The only oil and gas activity permitted in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests.

R.R. at 1793a.

15

The Board concluded that "the effect of Ordinance 127 constitutes a balancing of the benefits of preserving agriculture including utilizing oil and gas use upon agricultural areas encompassing no more than 30% of the Township, and, by limiting suburban growth." *Id.* As a result, the Board denied Objectors' substantive challenge to Ordinance 127 and their appeal of the zoning permit.

Objectors appealed the Board's decision to the trial court, and Rex, Geyer, and the Township intervened in Objectors' zoning appeal. The trial court ultimately affirmed the Board's decision without taking additional evidence. Objectors, the Township, Rex, and Geyer then filed the instant appeals of the trial court's affirmance of the Board's decision.[15]

## II.

We previously summarized Objectors' substantive due process claims as follows:

> Objectors first claim that the trial court erred in failing to correctly apply a substantive due process analysis under Article 1, Section 1 because Ordinance 127 was not a valid exercise of the Township's police powers and places an incompatible industrial use in the R-AG Residential Agriculture District in violation of the MPC. Specifically, Objectors assert that Ordinance 127 has substantially similar problems to Act 13's zoning scheme that was held to be invalid by this Court in *Robinson I* wherein this Court determined that the

---

[15] "In an appeal from a trial court's order affirming a decision of a zoning hearing board, where the trial court takes no additional evidence, our review is limited to considering whether the zoning hearing board abused its discretion or erred as a matter of law. The zoning hearing board abuses its discretion when it issues findings of fact that are not supported by substantial record evidence[.]" *In re Bartkowski Investment Group*, 106 A.3d 230, 237 (Pa. Cmwlth. 2014) (citation omitted).

16

placement of industrial uses in districts set aside for non-industrial uses makes zoning schemes irrational and unconstitutional. *See Robinson I*, 52 A.3d at 484 n.21, 485 n.23. They contend that Ordinance 127 is illogical, arbitrary, and discriminatory by permitting oil and gas development by right in agricultural and residential/agricultural zones and that it unduly disturbs their established expectations regarding their property rights, including public health, safety, and welfare. Likewise, Objectors submit that the trial court erred in its analysis of their MPC claims because Section 603 requires consistency with the Comprehensive Plan and protection of natural and historic features and resources, and Section 604 requires that ordinances be designed to provide adequate land for housing and to promote proper emergency response and to prevent the loss of health, life or property from fire, flood, panic or other dangers.

*Delaware Riverkeeper I*, slip op. at 17-18 (footnotes omitted).

This Court's opinion in *Frederick v. Allegheny Township Zoning Hearing Board*, 196 A.3d 677 (Pa. Cmwlth. 2018), *appeal denied*, ___ A.3d ___ (Pa., No. 449 WAL 2018, filed May 14, 2019), controls the disposition of the foregoing constitutional claim[16] rather than our prior analysis under *Gorsline I*. In

---

[16] Objectors claim that *Frederick* is not controlling with respect to the claims raised herein because *Frederick* is factually distinguishable, and the legal analysis therein is merely *dicta* because this Court found the undisputed facts in that case to be dispositive. *See* Remand Brief of Appellants at 54-57. We reject this assertion. In support, Objectors rely on evidence specifically rejected by the Board as not credible and continue to base their claims on the faulty premise that unconventional gas drilling is a fundamentally incompatible industrial use as a matter of law in the relevant zoning district. *See id.* In short, we will not accede to Objectors' request to reweigh the evidence, *see Frederick*, 196 A.3d at 688 ("[The board] 'as the fact finder, is the ultimate judge of credibility and resolves all conflicts of evidence' [and] 'has the power to reject even uncontradicted testimony if [it] finds the testimony lacking in credibility.'") (citations omitted); we are bound by the Board's findings that are supported by substantial record evidence, *see id.* ("Where [the board's] findings of fact are supported by substantial evidence, 'those findings of fact are binding upon this Court for purposes of appellate review.'") (citation omitted); and unconventional gas drilling does not constitute an incompatible industrial use in a residential/agricultural zoning district *per se* as a matter of law. *See Gorsline II*, 186 A.3d at 389

**(Footnote continued on next page…)**

17

*Frederick*, Allegheny Township enacted a zoning ordinance that established oil and gas development as a permitted use in all township zoning districts so long as a number of standards relating to public health, safety, and welfare were met, such as road safety, land clearing, security measures, emergency planning, and noise and

---

**(continued…)**

("[T]his decision should not be misconstrued as an indication that oil and gas development is never permitted in residential/agricultural districts, or that it is fundamentally incompatible with residential or agricultural uses[.]"). *See also Delaware Riverkeeper I*, slip op. at 25-26 n.22 in which we stated:

> The General Assembly has also recognized the compatibility between agricultural and oil and gas development uses in other contexts. *See* Section 14.1(c)(6)(i) of the Agricultural Area Security Law, Act of June 30, 1981, P.L. 128, *as amended*, added by Act of December 14, 1988, P.L. 1202, 3 P.S. §914.1(c)(6)(i) ("An agricultural conservation easement [purchased by the State Agricultural Land Preservation Board] shall not prevent . . . [t]he granting of leases . . . or the issuing of permits . . . for the exploration, development, storage or removal of . . . oil and gas by the owner of the subject land or the owner of the underlying . . . oil and gas or the owner of the rights to develop the underlying . . . oil and gas, or the development of appurtenant facilities related to . . . oil or gas development or activities incident to the removal or development of such minerals."); Section 6(c.1)(1) of the Pennsylvania Farmland and Forest Land Assessment Act of 1974, Act of December 19, 1974, P.L. 973, *as amended*, 72 P.S. §5490.6(c.1)(1) ("Land subject to preferential assessment may be leased or otherwise devoted to the exploration for and removal of gas and oil, including the extraction of coal bed methane, and the development of appurtenant facilities, including new roads and bridges, pipelines and other buildings or structures, related to exploration for and removal of gas and oil and the extraction of coal bed methane.").

As a result, we find the extensive and exhaustive legal analyses contained in *Frederick* to be dispositive with respect to the identical constitutional claims raised herein.

light controls. The zoning ordinance also required operators to meet all state and federal permitting requirements. Allegheny Township issued a "zoning compliance permit" to CNX Gas Company (CNX) to develop an unconventional gas well on property owned by Northmoreland Farms, LP (the Porter Pad) located in the R-2 Zoning District, which permits agricultural and residential uses.

As in the instant matter, a number of neighboring landowners (Neighbors) filed a validity challenge to the zoning ordinance with the Allegheny Township Zoning Hearing Board (ZHB) arguing:

> [The] Zoning Ordinance [] contravenes substantive due process because the Township failed to (1) consider the public interest of the community as a whole; (2) protect the lives, morals, health, comfort and general welfare; and (3) insure that an individual's use of his property will not infringe upon the property rights of neighboring property owners. [Neighbors] contend that the Township has failed to designate uses within the same district that are compatible and, thus, has engaged in impermissible "spot zoning."

*Frederick*, 196 A.3d at 687.

Initially, we outlined the standards by which we are to analyze these claims:

> A zoning ordinance is a valid exercise of the police power when it promotes public health, safety or welfare and its regulations are substantially related to the purpose the ordinance purports to serve. . . . In applying that formulation, Pennsylvania courts use a substantive due process analysis which requires a reviewing court to balance the public interest served by the zoning ordinance against the confiscatory or exclusionary impact of regulation on individual rights. . . . The party challenging the constitutionality of certain zoning provisions must establish that they are arbitrary, unreasonable and unrelated to the public health, safety,

19

morals and general welfare. . . . *Where their validity is debatable, the legislature's judgment must control. . . .*

Our Supreme Court has further explained:

> [t]he substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power, must accord substantial deference to the preservation of rights of property owners, within constraints of the ancient maxim of our common law, *sic utere tuo ut alienum non laedas* . . . [advising to] use your own property as not to injure your neighbors. A property owner is obliged to utilize his property in a manner that will not harm others in the use of their property, and zoning ordinances may validly protect the interests of neighboring property owners from harm.

> [Additionally, w]here a zoning hearing board's findings of fact are supported by substantial evidence, "those findings of fact are binding upon this Court for purposes of appellate review."

*Id.* at 687-88 (citations omitted and emphasis in original).

In rejecting Neighbors' substantive due process claims, we stated the following, in relevant part:

> Here, [ZHB] found that oil and gas operations have long existed in the R-2 Zoning District and provide needed income to Township residents, particularly farmers, so that they can maintain "their livelihood and way of life." Notably, in *Robinson Township II*, 83 A.3d at 954, the plurality recognized "that development promoting the economic well-being of the citizenry obviously is a legitimate state interest." [ZHB] found, as fact, that oil and gas operations, including shale gas development, have compatibly coexisted with other uses in the Township's rural areas for many years. To issue a permit, DEP, *inter alia*, specifically considers the impact of oil and gas drilling upon the community and environment and requires compliance with the setback

20

requirements in 58 Pa. C.S. §3215. *See, e.g.*, *Pennsylvania Independent Oil and Gas Association v. Department of Environmental Protection*, 146 A.3d 820 (Pa. Cmwlth. 2016), [*aff'd*, 161 A.3d 949 (Pa. 2017)] (discussing DEP's permitting process for unconventional gas wells). In accordance with these findings, [ZHB] concluded that [the] Zoning Ordinance [] represented an appropriate exercise of the police power.

Relying on the testimony of Dr. Stoltz and Steven Victor, [Neighbors] contend that unconventional gas wells will have a negative impact on the surrounding community. However, [ZHB] rejected the testimony of these witnesses as not credible because of their lack of knowledge about the Township's geography, its water resources or CNX's operations. A zoning hearing board, "as fact finder, is the ultimate judge of credibility and resolves all conflicts of evidence." *In re Appeal of Brickstone Realty Corporation*, 789 A.2d 333, 339 (Pa. Cmwlth. 2001). Indeed, a zoning hearing board "has the power to reject even uncontradicted testimony if [it] finds the testimony lacking in credibility." *Constantino v. Zoning Hearing Board of Borough of Forest Hills*, [618 A.2d 1193, 1196 (Pa. Cmwlth. 1992)]. Here, [ZHB] determined that [Neighbors] "did not present credible, substantial evidence" that the Porter Pad "will, in fact, have any adverse effect on public health, safety, welfare or the environment." [ZHB]'s reasons for this determination are fully explained and supported by the record.

* * *

[Neighbors] next argue that an "industrial" use such as a natural gas well is incompatible with and must be segregated from the other uses in the R-2 Zoning District. They argue that this Court's holding in *Robinson Township I*, 52 A.3d 463, supports this argument. We disagree.

In *Robinson Township I*, this Court held that Act 13 violated substantive due process because it deprived municipalities of the ability to evaluate their own

21

territorial features and to decide, as a local matter, where oil and gas operations should take place. We described Act 13's encroachment on a municipality's ability to determine what uses to allow in a zoning district to constitute a type of illegal "spot use." *See Robinson Township I*, 52 A.3d at 485 n.23.

By contrast, here, the municipality has evaluated its landscape and has chosen to allow oil and gas operations to take place in every zoning district, so long as certain exacting standards are satisfied. This Court's *Robinson Township I* substantive due process analysis is not applicable here because it addressed Act 13's deprivation of a municipality's ability to determine the placement of oil and gas operations. By contrast, [the] Zoning Ordinance [] expressed the will of the Township's residents by their elected Board of Supervisors.

[ZHB] held that [Neighbors] failed to prove that [the] Zoning Ordinance [] violated substantive due process. It held, to the contrary, that [the] Zoning Ordinance [] preserves the protected "rights of property owners" to realize the value of their mineral deposits but without causing cognizable injury to their neighbors. *In re Realen Valley Forge* [*Greenes Associates*, 838 A.2d 718, 728 (Pa. 2003)]. Discerning no error in [ZHB]'s conclusion, we hold that [the] Zoning Ordinance [] does not violate substantive due process.

*Id.* at 688, 690-91 (citations and footnotes omitted).

Likewise, in the case *sub judice*, the Board found that the "Township's history is steeped in the production of oil and gas from agricultural properties since the mid-nineteenth century to the present," and that the Township "has experienced residential growth as an exurb of the City of Pittsburgh." R.R. at 1778a (citations omitted). The Board also found that "Mr. Fodi, in drafting Ordinance 127 under [the] supervision of the Township Supervisors, viewed oil and gas activity as an integral part of agriculture and agricultural preservation,"

22

and that "[a]s drafted, Ordinance 127 balances between benefiting agricultural preservation and limiting sprawl." *Id.* at 1785a.

As the Board explained:

> Although the Township Supervisors' view, that oil and gas production is part and parcel of an agricultural use, is contrary to the conclusion asserted by [Objectors] that oil and gas production is not part and parcel of an agricultural use, the contrary conclusions do not make the Supervisors' conclusion wrong. Instead their view is merely different. The Township Supervisors, through the passage of Ordinance 127, view oil and gas drilling activities as a way to help preserve agricultural activity. Their view is supported by the competent expert testimony of Attorney Sittig and the lay testimony of Ms. Morley and Ms. Hawkins Peterson. The Supervisors also view unchecked suburban growth as being associated with air and water pollution, traffic issues, and sewer and water costs. Where [Objectors] view agriculture and residential to be nearly synonymous, with a perspective that favors residential, the Supervisors do not, instead viewing residential and agricultural as distinct and different uses in a mixed-use district that must be balanced. The [Board] finds the Supervisors' view, espoused through the passage of Ordinance 127, to be credible.

R.R. at 1786a.

The Board further found, "The Township Supervisors and Mr. Fodi in preparing Ordinance 127 acted as trustees for the benefit of future generations of Middlesex Township residents by weighing the necessity of oil and gas production in farm areas versus the containment of residential growth in farm areas," and that

23

"[t]he Township Supervisors, in enacting Ordinance 127, properly exercised their legislative function." *Id.*[17]

As we stated in our prior opinion in this matter:

[T]here is substantial evidence supporting the Board's determination that the "oil and gas well site development" use is compatible with the other permitted agricultural and residential uses and that it will limit sprawl and protect agricultural land. R.R. at 2188a, 2193a, 2194a, 2207a- 2208a, 2214a, 2231a. *See also id.* at 693a-694a, 703a-705a, 2574a-2576a, 2581a-2582a. This is consistent with the stated general purposes of Ordinance 127 and the R-AG Residential Agriculture District created by Ordinance 125. *Id.* at 34a, 1760a. As the Board explained, the Township's Supervisors "balanced the community's costs and benefits of oil and gas production as evidenced by, on one hand, Ordinance 127's exclusion of oil and gas activity from 'purely' residential zones, such as R-1, R-2 and PRD districts, to on the other hand, viewing oil and gas drilling as part and parcel of an agricultural district." R.R. at 1792a.

Moreover, Objectors failed to sustain their burden of demonstrating by credible testimony that the presumptively valid Ordinance 127 is "arbitrary, unreasonable and unrelated to the public health, safety, morals and general welfare." *Boundary Drive Associates* [*v. Shrewsbury Township Board of Supervisors*, 491 A.2d 86, 90 (Pa. 1985)]. As noted above, the Board found that "[t]he answer to whether the temporary industrial use poses a danger to the health, safety and welfare of the residents of [the] Township remains unanswered by the woefully inadequate scientific expert testimony presented in this case," and concluded that Objectors "failed to

---

[17] *See also* R.R. at 1793a-1794a ("In mixed use districts of residential and agricultural districts, such as the epicenter R-AG district, it is rational to preserve agricultural districts to maintain a check on the growth of residential districts. Oil and gas drilling provides a financial mechanism by which the free market can preserve agriculture. Ordinance 127 therefore bears a substantial relationship to public health, safety and welfare as well as a balancing of interests.").

24

prove a health hazard to the community by their use of woefully inadequate scientific testimony." R.R. at 1790a. *See, e.g.*, *Christman v. Zoning Hearing Board of the Township of Windsor*, 854 A.2d 629, 635 (Pa. Cmwlth. 2004) ("It was Landowners' burden to establish the zoning map amendment was arbitrary and unreasonable. As discussed hereafter, the ZHB was unpersuaded by Landowners' vague proof on the issue, and it found Landowners offered no credible evidence that the Ordinance was arbitrary and unreasonable. As the ZHB concluded Landowners failed to meet their burden based on credibility findings, no error is evident.") (citations omitted).

*Delaware Riverkeeper I*, slip op. at 27-28 (footnote omitted).

As in *Frederick*, the Board's findings in the instant matter are not subject to our review because they are based on substantial evidence, and amply support its determination that the enactment of Ordinance 127 was an appropriate result of the Township Board of Supervisors' exercise of its legislative function of weighing the foregoing competing interests. As a result, Objectors have not presented a cognizable substantive due process claim with respect to the enactment of Ordinance 127.

Additionally, as in *Frederick*, we have properly rejected Objectors' "spot use" claim in our prior opinion in this matter:

Objectors' reference to "spot use" in *Robinson I*, 52 A.3d at 484 n.21, 485 n.23, was in the context of the statewide mandate of the invalid provisions of Act 13. In contrast, the "oil and gas well site development" use in Ordinance 127 is permitted in mixed-use districts in the Township. As noted above, the Board found that natural gas compressor stations are permitted uses in non-residential I-1, AG-A, AG-B, and C-3 Zoning Districts, but are not permitted in the R-AG Agriculture Residential District because it is within the Township's PRD district. R.R. at 1780a, 1793a. The Board properly concluded that "[t]he only oil and gas activity permitted

25

in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests." *Id.* at 1793a. This is not an impermissible "spot use." *See Plaxton v. Lycoming County Zoning Hearing Board*, 986 A.2d 199, 211 (Pa. Cmwlth. 2009), *appeal denied*, 8 A.3d 900 (Pa. 2010) ("Here, Objectors' spot zoning and/or special legislation claims are unavailing. To that end, we observe that the property upon which [the lessee] proposes to construct its wind energy facility was not rezoned in a manner so as to subject it to unjustifiably different treatment from similar surrounding land. Indeed, the ordinance amendments did not rezone the property at issue at all; rather, the effect of the amendments is simply to permit, by right, wind energy facilities in all of the County's Agricultural, Countryside and RP zoning districts. Therefore, Objectors' spot zoning claim fails here.").

*Delaware Riverkeeper I*, slip op. at 26 n.23.

Finally, as in *Frederick*, we have properly rejected Objectors' claims of purported MPC violations:

Section 603(g)(1), (h) and (i) of the MPC states that "ordinances shall protect prime agricultural land," "shall encourage the continuity, development and viability of agricultural operations," and "shall provide for the reasonable development of minerals." 53 P.S. §§10603(g)(1), (h), (i). In turn, Section 107 of the MPC defines "minerals" as including "crude oil and natural gas." 53 P.S. §10107. Likewise, Section 604(3) and (5) states that "[t]he provisions of zoning ordinances shall be designed . . . to preserve prime agriculture and farmland" while "accommodat[ing] reasonable overall community growth." 53 P.S. §10604(3), (5). The substantial evidence demonstrates that Ordinance 127 accomplishes the foregoing while limiting oil and gas development to certain zoning districts in the Township. The fact that such a use may conflict with the Township's Comprehensive Plan is not a basis upon which the Board may invalidate Ordinance 127. *See* Section 303(c) of the MPC, 53 P.S. §10303(c) ("[N]o action by the governing

26

body of a municipality shall be invalid nor shall the same be subject to challenge or appeal on the basis that such action is inconsistent with, or fails to comply with, the provision of a comprehensive plan.").

*Delaware Riverkeeper I*, slip op. at 28-29.

In sum, we again conclude that "[b]ased on the foregoing, the Board did not err in rejecting Objectors' substantive challenge to Ordinance 127 as violative of Article 1, Section 1 of the Pennsylvania Constitution and the trial court did not err in affirming this determination." *Id.* at 29.

## III.

We previously summarized Objectors' claims regarding the Environmental Rights Amendment as follows:

> Objectors next claim that the trial court also failed to apply the relevant constitutional analysis for their Article 1, Section 27 claims. They argue that the Township failed to assess whether the ordinance would cause unreasonable "actual or likely degradation" of air or water quality. *See Robinson II*, 83 A.3d at 951-55. They contend that the Township also violated its fiduciary duty as trustee under Section 27 by issuing the permit without first considering the environmental effect of the action on the constitutionally protected features; failing to exercise prudence respecting the environment; treating all beneficiaries of the trust equally; and protecting the natural environment over development and disturbance. *Robinson II*, 83 A.3d at 952, 957-58, 959, 973 n.55.

> Objectors argue that Ordinance 127 suffers from the same infirmity of Act 13 that was stricken in *Robinson II*, *i.e.*, that it permits "industrial" oil and gas development in non-industrial zoning districts.

27

*Delaware Riverkeeper I*, slip op. at 29-30. We again find that *Frederick* controls our analysis and disposition of this claim.

With respect to the Township's duty under the Environmental Rights Amendment, in *Frederick* we explained:

> The plurality in *Robinson Township II* criticized *Payne v. Kassab*, [312 A.2d 86 (Pa. Cmwlth. 1973), *aff'd*, 361 A.2d 263 (Pa. 1976)], which established a three-part test to determine whether government action complied with the Environmental Rights Amendment. *Robinson Township II* did not reverse [*Payne*], and this Court continued to apply the *Payne* test to analyze alleged violations of the Environmental Rights Amendment. *See, e.g.*, *Funk v. Wolf*, 144 A.3d 228, 234 (Pa. Cmwlth. 2016) ("The *Payne* test is particularly applicable in situations where a person challenges a government decision or action.").

> However, in 2017, the Supreme Court overruled the *Payne* test in [*PEDF II*]. . . .

> In [*PEDF II*], the Supreme Court addressed each of the three sentences in the Environmental Rights Amendment. It observed that "the right of citizens to clean air and pure water, and to the preservation of natural, scenic, historic values of the environment[]" set forth in sentence one "places a limitation on the state's power to act contrary to this right, and while the subject of this right may be amenable to regulation, any laws that unreasonably impair the right are unconstitutional." [161 A.3d] at 931 (citing *Robinson Township II*, 83 A.3d at 951). Also, in *Robinson Township II*, the plurality stated expressly that "the constitutional obligation binds all government, state or local, concurrently." *Robinson Township II*, 83 A.3d at 952 (citation omitted).

> The precise duties imposed upon local governments by the first sentence of the Environmental Rights Amendment are by no means clear. In the first case to address the Environmental Rights Amendment,

28

our Supreme Court observed that the values protected in the first sentence are subject to interpretation:

> "[C]lean air" and "pure water" require technical definitions, since they depend, to some extent, on the technological state of the science of purification. The other values, "the natural, scenic, historic and esthetic values" of the environment are values which have heretofore not been the concern of government.

*Shapp v. National Gettysburg Battlefield Tower, Inc.*, [311 A.2d 588, 593 (Pa. 1973)]. The uncertainty posed by these values placed a property owner at risk of not knowing to what use he could put his property, a result the Supreme Court described as "unjust." *Id.* The Supreme Court cautioned that this lack of certainty raised "serious questions under both the equal protection clause and the due process clause of the United States Constitution." *Id.*

In *Robinson Township II*, the Supreme Court plurality acknowledged these constitutional concerns. The plurality explained that the "Environmental Rights Amendment does not call for a stagnant landscape" or "for the derailment of economic or social development" or "for a sacrifice of other fundamental values." *Robinson Township II*, 83 A.3d at 953. The plurality further explained that

> the first clause of Section 27 *does not impose express duties on the political branches to enact specific affirmative measures* to promote clean air, pure water, and the preservation of the different values of our environment . . . .

*Id.* at 951 (emphasis added). Nevertheless, when the government acts, "*it must reasonably account for the environmental features* of the affected locale. . . ." *Id.* (emphasis added). Judicial review of the government's action requires an evidentiary hearing to determine, first, whether the values in the first clause of the Environmental Rights Amendment are implicated and,

29

second, whether the governmental action unreasonably impairs those values.

Zoning accounts for the "natural, scenic, historic and esthetic values of the environment." PA. CONST. art. I, §27. It does so by placing compatible uses in the same zoning district; by establishing minimum lot sizes and dimensional requirements; providing parking and signage controls; and requiring landscape and screening controls. This list goes on. It is axiomatic that a zoning ordinance must balance the public interests of the community with the due process rights of private property owners. *Village of Euclid v. Ambler Realty Company*, 272 U.S. 365, 387-88 [(1926)]; *National Gettysburg Battlefield Tower, Inc.*, 311 A.2d at 593-94. Further, as a creature of statute, the Township can exercise only those powers that have been expressly conferred upon it by the General Assembly in the MPC and in the Second Class Township Code,[18] by which the Township was created. When a municipality enacts a zoning ordinance, it is bound by the Environmental Rights Amendment and by all the rights protected in Article I of the Pennsylvania Constitution. All must be considered. *See Cavanaugh v. Davis*, [440 A.2d 1380, 1382 (Pa. 1982)] ("[B]ecause the Constitution is an integrated whole, effect must be given to all of its provisions whenever possible.").

Objectors assert the Township did not "genuinely consider" the environment in the enactment of [the] Zoning Ordinance [] or in the issuance of the permit to CNX. Objectors' Brief at 47. They presume, contrary to the plurality's instruction in *Robinson Township II*, 83 A.3d at 952, that local governments must enact "specific affirmative measures" to protect the environment that are duplicative of the many state laws that regulate oil and gas operations in Pennsylvania.

---

[18] Act of May 1, 1933, P.L. 103, *as amended*, 53 P.S. §§65101-68701. Like the township in *Frederick*, the Township in the case *sub judice* is a Second Class Township. *See* 123 The Pennsylvania Manual 6-122 (2017); *Emert v. Larami Corporation*, 200 A.2d 901, 902 n.1 (Pa. 1964) ("Courts will take judicial notice of geographical facts such as the county in which a town or city is located.") (citations omitted).

30

Moreover, *Robinson Township II* did not give municipalities the power to act beyond the bounds of their enabling legislation. Municipalities lack the power to replicate the environmental oversight that the General Assembly has conferred upon DEP and other state agencies. Neither [*PEDF II*] nor *Robinson Township II* has altered these fundamental principles of Pennsylvania's system of state and local governance.

Section 3302 of the Oil and Gas Act specifically states that a municipality lacks the power to regulate how gas wells operate. Section 3302 provides that "local ordinances purporting to regulate oil and gas operating regulated by Chapter 32 (relating to development) are hereby superseded. No local ordinance adopted pursuant to the MPC or the Flood Plain Management Act[19] shall contain provisions that impose conditions, requirements or limitations" on oil and gas operations regulated by the Oil and Gas Act. 58 Pa. C.S. §3302. Although the last sentence of Section 3302 has been declared unconstitutional, this preemption language was left intact.

In sum, a municipality may use its zoning powers only to regulate *where* mineral extraction takes place. *Huntley & Huntley v. Borough Council*, [964 A.2d 855 (Pa. 2009)]. A municipality does not regulate how the gas drilling will be done. Objectors' complaints about the purported harm to the environment from the operations of the Porter Pad project should have been addressed to the state agencies that issued CNX its operating permits.

In any case, [ZHB] found that oil and gas development and agricultural uses "have long safely coexisted within rural communities." Board Decision at 42. The only feature of the Porter Pad that will be visible from any of Objectors' homes is the portion of the drilling rig that rises over the treetops. Board Decision at 37; Finding of Fact No. 69. Once drilling operations

---

[19] Act of October 4, 1978, P.L. 851, 32 P.S. §§679.101–679.601.

cease, the rig will be removed during the pumping phase. When pumping ends, the land can be returned to its original state. *Id.* at 40; Finding of Fact No. 97. In the meantime, oil and gas drilling will support the agricultural use of land in the R-2 Zoning District. Objectors did not challenge any of these factual findings.

Objectors did not prove that [the] Zoning Ordinance [] is a law that "unreasonably impairs" their rights under the Environmental Rights Amendment. Objectors did not prove that [the] Zoning Ordinance [] does not reasonably account for the natural, scenic, historic and esthetic values of the Township's environment. Indeed, [ZHB] reached the contrary conclusion. It credited the testimony of CNX's expert, Professor Pifer, who stated that there is a long history of oil and gas development safely coexisting with agricultural uses in the rural areas of the Township and that unconventional gas development will actually help preserve farming in the R-2 District. We hold that [the] Zoning Ordinance [] does not violate the Environmental Rights Amendment.

*Frederick*, 196 A.3d at 692-98 (footnotes omitted and emphasis in original).

Likewise, in the case *sub judice*, the Board credited Fodi's testimony that the "Township's history is steeped in the production of oil and gas from agricultural properties since the mid-nineteenth century to the present," and that "in drafting Ordinance 127 under the supervision of the Township Supervisors, viewed oil and gas activity as an integral part of agriculture and agricultural preservation." R.R. at 1777a, 1778a, 1785a, 2138a. Again, as stated in our prior opinion in this matter:

[T]here is substantial evidence supporting the Board's determination that the "oil and gas well site development" use is compatible with the other permitted agricultural and residential uses and that it will limit sprawl and protect agricultural land. R.R. at 2188a, 2193a, 2194a, 2207a- 2208a, 2214a, 2231a. *See also id.*

at 693a-694a, 703a-705a, 2574a-2576a, 2581a-2582a. This is consistent with the stated general purposes of Ordinance 127 and the R-AG Residential Agriculture District created by Ordinance 125. *Id.* at 34a, 1760a. As the Board explained, the Township's Supervisors "balanced the community's costs and benefits of oil and gas production as evidenced by, on one hand, Ordinance 127's exclusion of oil and gas activity from 'purely' residential zones, such as R-1, R-2 and PRD districts, to on the other hand, viewing oil and gas drilling as part and parcel of an agricultural district." R.R. at 1792a.

*Delaware Riverkeeper I*, slip op. at 27-28.

Based upon their findings of fact, the Board properly concluded:

[] The Township Supervisors' view that the totality of oil and gas production, both during drilling and after reclamation, is compatible with an agricultural district is rational. First, that has been the history of Middlesex Township, both in the very long term and in its more recent experience with the three prior unchallenged oil and gas well pads. Second, competent testimony was provided that oil and gas production helps support agricultural activity and preservation, which in turn helps keep suburban growth in check. Third, to limit oil and gas drilling to a traditional industrial zone, or to subject a well pad to a two-mile exclusion zone, as advocated by the experts for the [Objectors] would constitute exclusionary zoning.

[] The totality of oil and gas drilling on a site, such as the Geyer farm, is not an industrial use, but it is instead a use traditionally exercised in agricultural areas, containing components of an industrial use. The industrial use components, although of a great impact, are temporary in nature and largely cease after reclamation. To limit oil and gas drilling activities to a traditionally zoned industrial district based on their industrial incidents[, as in "connected with" and not as in "accidents,"] is irrational.

33

[] Oil and gas activities are specifically excluded by Ordinance 127 from exclusively zoned residential districts, be it R-1, R-2 or within any PRD overlay district. This exclusion encompasses the three components of oil and gas drilling – well pads, processing plants and compressor stations. In addition, compressor stations and processing plants are not permitted in the R-AG district. The only oil and gas activity permitted in the R-AG mixed use district is an oil and gas well pad and its temporary industrial components. All of these limitations on oil and gas use evidence rational planning and a balancing of interests.

[] In mixed use districts of residential and agricultural districts, such as the epicenter R-AG district, it is rational to preserve agricultural districts to maintain a check on the growth of residential districts. Oil and gas drilling provides a financial mechanism by which the free market can preserve agriculture. Ordinance 127 therefore bears a substantial relationship to public health, safety, and welfare as well as a balancing of interests.

[] As previously stated, [Objectors] have failed to meet their burden that oil and gas drilling pads will injure their neighbors. Admittedly, the oil company has not established that no harm will occur. The concerns of the credible witnesses are reasonable. But, the burden of proof lies upon [Objectors] and the evidence they presented was woefully inadequate and did no justice to their local constituents.

[] The Township Supervisors, as set forth above, have acted in their role as trustee for future generations, as required by Article I, §27 of the Pennsylvania Constitution, by helping to preserve agricultural resources for future generations. They did not act in a vacuum, they did not act with due disregard for the residents of [the] Township. Instead the effect of Ordinance 127 constitutes a balancing of the benefits of preserving agriculture including utilizing oil and gas use upon agricultural areas encompassing no more than 30% of the Township, and by limiting suburban growth.

34

R.R. at 1792a-1794a (footnote omitted).  Based on the foregoing and based on our analysis in *Frederick* applying the Supreme Court's opinion in *PEDF II*, we hold that Ordinance 127 does not violate the Environmental Rights Amendment to the Pennsylvania Constitution.

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge


Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Delaware Riverkeeper Network,                  :
Clean Air Council, David Denk,                 :
Jennifer Chomicki, and Joann Groman,           :
                                               :
                    Appellants                 :
                                               :
         v.                                    :   No. 2609 C.D. 2015
                                               :
Middlesex Township Zoning                      :
Hearing Board                                  :
                                               :
         v.                                    :
                                               :
PennEnergy Resources, LLC,                     :
Middlesex Township, and                        :
Robert G. Geyer                                :


**O R D E R**


         AND NOW, this 26<u>th</u> day of <u>June</u>, 2019, the order of the Butler
County Court of Common Pleas dated November 19, 2015, at No. 15-10429, is
AFFIRMED.


                              _____
                              MICHAEL H. WOJCIK, Judge